*Brandon Haw v. National Collegiate Athletic Association*, No. 866, Sept. Term 2022.
Opinion by Arthur, J.

**PERSONAL JURISDICTION – SPECIFIC JURISIDICTION OVER NONRESIDENT ENTITY**

In this case, a Maryland resident brought suit against the National Collegiate Athletic Association (NCAA), an unincorporated association of colleges and universities that issues and enforces rules governing college athletics. The plaintiff alleges that he suffers from neurodegenerative brain disease caused by repeated head trauma that he sustained while playing college football. The plaintiff alleges that, despite possessing extensive knowledge of the dangers of brain disease caused by playing football, the NCAA failed to inform players of the dangers known to the NCAA, failed to establish rules of the game to make it reasonably safe, and failed to establish a protocol for the diagnosis and treatment of concussive injuries.

The Appellate Court of Maryland held that the NCAA was subject to specific personal jurisdiction in Maryland with respect to the claims in this action. The NCAA has purposefully directed its activities at Maryland by issuing comprehensive rules for college football, including rules related to the recruitment of athletes, rules related to gameplay, and rules related to the health and safety of athletes. The claims raised by the plaintiff, who alleges that his injuries result from the NCAA's negligent or reckless rulemaking, are related to those purposefully-directed activities. As a Maryland resident who claims to have suffered part of his injury in Maryland, the plaintiff established an adequate link between his claims and those forum-directed activities.

Although the Court held that the NCAA was subject to specific jurisdiction in this action, the Court rejected two alternative grounds for personal jurisdiction presented by the plaintiff. The plaintiff contended that the NCAA should be subject to specific jurisdiction based on the actions of the NCAA member schools that attempted to recruit the plaintiff to play college football and one member school that entered into a contract to give the plaintiff an athletic scholarship. The Court concluded that the plaintiff failed to establish that an agency relationship existed between the NCAA and its members or to establish some other basis for imputing the actions of the members to the NCAA itself.

The plaintiff also contended that the NCAA should be subject to general or all-purpose jurisdiction in Maryland. The NCAA, an unincorporated association with its headquarters in Indiana, lacks any affiliation with Maryland comparable to one that would make a corporation subject to general jurisdiction in Maryland. The Court rejected the plaintiff's theories that a different standard should be used to evaluate where an unincorporated association is subject to general jurisdiction.

Circuit Court for Baltimore City
Case No. 24-C-21-005753

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 866

September Term, 2022

_____

BRANDON HAW

v.

NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION

_____

Arthur,
Reed,
Albright,

JJ.

_____

Opinion by Arthur, J.

_____

Filed: February 1, 2024

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

This appeal addresses the circumstances in which a Maryland trial court may exercise personal jurisdiction over the National Collegiate Athletic Association (NCAA), an unincorporated association of colleges and universities that issues and enforces rules governing intercollegiate athletics throughout the United States.

The plaintiff is a Maryland resident who suffers from permanent neurodegenerative brain disease allegedly resulting from repeated head trauma that he sustained while playing college football. The plaintiff alleges that the NCAA caused his condition by failing to inform players of the dangers of brain disease caused by playing college football and failing to protect players from those dangers. The Circuit Court for Baltimore City concluded that it could not exercise personal jurisdiction over the NCAA in this action.

The plaintiff has appealed from the order dismissing the action for lack of personal jurisdiction. For the reasons explained in this opinion, the judgment will be reversed. Although we reject some of the grounds for personal jurisdiction proposed by the plaintiff, we conclude that the NCAA is subject to specific jurisdiction in Maryland with respect to the claims in this action. The NCAA will not be denied due process of law if it is required to defend these claims for injuries allegedly caused by the NCAA's rules governing college football in the courts of one of the states targeted by those rules.

**FACTUAL AND PROCEDURAL BACKGROUND**

**A.      Defendant: National Collegiate Athletic Association**

More than a century ago, as college football was first gaining popularity in the United States, "[s]erious injuries were common, and it was not unheard of for players to

be killed during games." *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 802 F.3d 1049, 1053 (9th Cir. 2015). In 1905, President Theodore Roosevelt "invite[d] leaders of collegiate football . . . to the White House for a discussion on reforming or abolishing the game during a season that produced 18 deaths and 149 serious injuries attributed to the sport." NCAA, *Timeline – 1900s*, http://ncaa.org/sports/2021/6/14/timeline-1900s.aspx (archived at https://perma.cc/3HTK-EK6Z). By the next year, "the presidents of 62 colleges and universities founded the Intercollegiate Athletic Association to create uniform rules for college football." *O'Bannon v. National Collegiate Athletic Ass'n*, 802 F.3d at 1053. Since 1910, that association has been known as the National Collegiate Athletic Association (NCAA). *Id*.

The NCAA is a non-profit, unincorporated association that currently maintains its headquarters in Indianapolis, Indiana. The NCAA describes itself as "a voluntary, self-governing organization of four-year colleges, universities and conferences committed to the well-being and development of student-athletes, to sound academic standards and the academic success of student-athletes, and to diversity, equity and inclusion." 2022-23 NCAA Division I Manual, Constitution, preamble.[1] "The basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics . . . as an integral part of the education program and the student-athlete as an integral part of the

---

[1] Available at https://www.ncaapublications.com/p-4657-2022-2023-ncaa-division-i-manual.aspx (archived at https://perma.cc/W9LT-D7RP). Although this document is not included in the record, Mr. Haw included quotations from the NCAA Constitution in his complaint. In their appellate briefs, both parties have cited the 2022-23 Division I Manual, which includes the NCAA Constitution and bylaws.

student body." *Id.*

"Over the decades, the NCAA has become a sprawling enterprise." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. ___, ___, 141 S. Ct. 2141, 2150 (2021). Currently, about 1,100 colleges and universities are members of the NCAA. These member institutions include schools from all 50 states, the District of Columbia, Puerto Rico, and even Canada. Each year, nearly half a million student-athletes compete in NCAA-sanctioned sports across the country. Millions of people watch NCAA competitions in person or on television.

The NCAA organizes its member schools into three divisions, of which Division I has the largest and most competitive athletic programs. "Division I teams are often the most popular" among viewers and "attract the most money and the most talented athletes." *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. at ___, 141 S. Ct. at 2150. The NCAA charges and collects annual dues from each of its members and distributes revenue to members in Division I and Division II. The NCAA earns revenue from contracts for the licensing of NCAA-branded content, goods, and merchandise; contracts for the right to broadcast NCAA championship games; and ticket sales for NCAA championship games. In 2021, the NCAA earned revenue of $1.155 billion.

NCAA members have adopted a constitution governing the structure and principles of the Association. One of the stated "Principles" is "Student-Athlete Well-Being." The NCAA Constitution states: "Intercollegiate athletics programs shall be conducted by the Association, divisions, conferences and member institutions in a manner designed to protect, support and enhance the physical and mental health and

3

safety of student-athletes." 2022-23 NCAA Division I Manual, Constitution, Art. 1(D). Another of the NCAA's "Principles" is "Institutional Control." Under this principle: "It is the responsibility of each member institution to monitor and control its athletics program and to provide education and training to ensure compliance with the rules established by the Association, its division and conference." *Id.*, Art. 1(E).

Through a multi-tiered structure, the NCAA, its divisions, and its conferences issue rules and regulations governing athletic competitions among NCAA member schools. The NCAA has established rules committees for each sport to "establish and maintain rules of play in its sport consistent with the sound traditions of the sport and of such character as to ensure good sportsmanship and safe participation by competitors." 2022-23 NCAA Division I Manual, Operating Bylaws, § 21.6.1.3. Among other matters, the NCAA's rules address the eligibility of student-athletes, recruitment of student-athletes by member institutions, and scholarships and other financial aid that member institutions may provide to student-athletes. The NCAA enforces its rules through an "Infractions Program," which authorizes penalties or sanctions against member institutions for violations of NCAA rules.

In addition to other matters addressed by the NCAA, the NCAA "develop[s] and promulgate[s] guidance, rules and policies based on consensus of the medical, scientific, sports medicine and sport governing communities, as appropriate, for student-athlete physical and mental health, safety and performance." 2022-23 NCAA Division I Manual, Constitution, Art. 2(A)(2)(b). The NCAA Constitution states that member institutions must "[e]stablish an administrative structure that provides independent

4

medical care for student-athletes, affirms the autonomous authority of primary athletics health care providers, and implements NCAA guidance, rules and policies based on consensus of the medical, scientific, sports medicine, and sport governing communities." *Id.*, Art. 2(D)(1)(d). It further provides: "The physicians and health care staff at each member institution have the ultimate decision-making authority over the health and welfare of student-athletes." *Id.*

### B.    Plaintiff: Brandon Haw

Brandon Haw was born and raised in Prince George's County, Maryland. He attended Fairmont Heights High School in Capitol Heights, graduating in 1999. During high school, he distinguished himself as a talented football player, playing several positions, including defensive back and kick return specialist.

Beginning in the spring of 1998, when he was 17 years old, several NCAA Division I colleges attempted to recruit Mr. Haw to play college football. Over the next year, these colleges directed hundreds of communications by phone, letter, or email to Mr. Haw and to his father. Recruiters from at least two of these colleges personally attended his high school sporting events in Maryland. At one such event, he and his father spoke with the chief recruiter for Rutgers University. Mr. Haw and his father lived in Maryland throughout this recruitment process.

In December 1998, the head football coach of Rutgers University mailed a letter to

Mr. Haw's home address, offering him "a full NCAA Grant-In-Aid scholarship"[2] upon

his completion of "academic criteria set by the NCAA and Rutgers[.]" At the same time,

a Rutgers recruiting coordinator sent a letter to his parents, explaining certain terms of the

scholarship offer. Mr. Haw formally accepted this scholarship offer at his high school on

national signing day in February 1999.

From 1999 through 2003, Mr. Haw played football at Rutgers University as a

cornerback and kick return specialist. Throughout his last three seasons, he played as a

starter for the Rutgers defense. During one year in which he could not play in games

because of an injury, he continued to practice with the team.

While attending college at Rutgers, Mr. Haw lived in New Jersey, but maintained

his permanent residence in Maryland. After college, he played professional football for a

few years before returning to Maryland. He has resided in Baltimore City since 2007.

In the years after his football career ended, Mr. Haw began to exhibit symptoms of

chronic traumatic encephalopathy (CTE), a neurodegenerative disease caused by repeated

head trauma.

C.      **Mr. Haw's Complaint Against the NCAA**

On December 21, 2021, Mr. Haw filed a complaint against the NCAA in the

Circuit Court for Baltimore City. Mr. Haw sought to recover damages to compensate

him for the "permanent neurogenerative brain disease" that he suffers as the result of the

---

[2] "A full grant-in-aid is financial aid that consists of tuition and fees, room and board, books and other expenses related to attendance at the institution[.]" 2022-23 NCAA Division I Manual, Operating Bylaws, § 15.02.6.

NCAA's alleged "negligence and reckless disregard for his health and safety" during the time that he played college football.

According to the complaint, Mr. Haw has been diagnosed with chronic traumatic encephalopathy. He suffers from severe impairment in the domains of executive function and learning and memory. His symptoms include memory loss, personality change, and a permanent neurological impairment. He alleged that this condition has compromised his health, has rendered him unemployable, and will require extensive future medical care. His alleged damages include out-of-pocket expenses, lost earnings, emotional distress, and pain and suffering.

Mr. Haw alleged that his condition results from injuries that he sustained during the five years in which he played football at Rutgers University. He also alleged that he sustained "one or more concussions" while playing college football, including one "serious concussion," after which he was hospitalized. He alleged that he sustained repeated concussive and sub-concussive injuries during "every" game and practice in which he participated. He claimed that, because the NCAA's rules and regulations did not require the presence of trained medical personnel on the sidelines, his injuries were never identified or treated. As a result, he claims, he played through these injuries without proper examination, rest, or treatment.

Mr. Haw claimed that his injuries resulted from the NCAA's failure to take measures reasonably necessary to protect college football players. According to the complaint, the NCAA has undertaken a duty to protect the health and safety of college athletes. Mr. Haw alleged that, since as early as the 1930s and continuing through the

7

time of his college football career, medical authorities repeatedly informed the NCAA that the head impacts routinely sustained in the game of football cause long-term brain disease. He alleged that medical authorities also informed the NCAA that repeated concussions make players more susceptible and less resistant to concussive injuries. He alleged that, despite this knowledge, the NCAA failed to establish a concussion-management plan for the identification, diagnosis, and treatment of concussive injuries. Mr. Haw also alleged that the NCAA failed to implement rules to reduce the frequency and severity of concussive injuries in college football.

Mr. Haw further alleged that the NCAA failed to warn or inform players or their families that playing college football subjects a player to long-term risks of permanent brain injury and lifelong impairment. According to the complaint, in 1994, the NCAA published to its member institutions a medical handbook that included inadequate advice about how to handle concussive injuries. The complaint alleged that, although the NCAA oversees the form of the "letter of intent" that high school students sign when they are recruited to play college sports,[3] the NCAA failed to include any language that would inform players and parents of the health risks known to the NCAA. In addition, the complaint alleged that the NCAA published false statements claiming that plastic helmets and mouthguards protect football players against concussions.

In the first count of the complaint, Mr. Haw raised a claim of negligence. He

---

[3] The "National Letter of Intent" is "the official document administered by the Collegiate Commissioners Association and used by subscribing member institutions to establish the commitment of a prospective student-athlete to attend a particular institution." 2022-23 NCAA Division I Manual, Operating Bylaws § 13.02.12.

8

alleged that the NCAA owed a duty of care to him as a college football player. He alleged that the NCAA breached this duty by failing to establish rules to make the game of football reasonably safe, by failing to implement an effective concussion protocol, and by concealing information from players and their families or otherwise failing to inform them about the dangers of repeated head impacts.

In the second count of the complaint, Mr. Haw alleged that the NCAA made intentional misrepresentations when it published statements claiming that plastic helmets and mouthguards protect football players against concussions. He alleged that these false statements misled him and other players into believing that they could rely on their equipment to protect them from brain injuries.

In the third count, Mr. Haw raised a claim of misrepresentation by concealment. He alleged that the NCAA knowingly concealed medical research and other information about the risk of brain disease caused by the head impacts that players frequently sustain in football games and practices. He alleged that the NCAA knew that this information would be a substantial factor in an athlete's decision to play college football.

The final count raised a claim for constructive fraud. That count incorporated the previous allegations about the NCAA's failure to disclose information about the dangers of concussive injuries in college football and failure to protect the safety and health of players. That count further alleged that the NCAA had a special relationship with college football players, under which players placed their trust and confidence in the NCAA to protect them and to inform them regarding health and safety issues.

Under all counts, Mr. Haw sought compensatory damages, including non-

9

economic damages. For the final three counts, Mr. Haw also sought an award of punitive damages.

##### D. Motion to Dismiss for Lack of Personal Jurisdiction

After service of the complaint, the NCAA filed a motion to dismiss for lack of personal jurisdiction under Md. Rule 2-322(a). The NCAA supported its motion with an affidavit from one of its executive directors, who affirmed that the NCAA maintains its principal place of business in Indianapolis, Indiana.

Mr. Haw filed a response in opposition to the motion. Along with his response, he provided an affidavit from his father, who affirmed facts about communications sent by Rutgers University and other NCAA member schools in their efforts to recruit him to play college football. Mr. Haw also provided various other exhibits as evidence of purported contacts between the NCAA or its members and Maryland. In the event that the court might determine that he had not established a basis for the exercise of personal jurisdiction, Mr. Haw asked for leave to conduct jurisdictional discovery concerning the NCAA's activities in Maryland.

The parties' arguments addressed two types of personal jurisdiction: general jurisdiction and specific jurisdiction. Broadly speaking, in an exercise of general jurisdiction, a defendant is subject to suit for "any and all claims" in the courts of a state if the defendant is "essentially at home" in that state. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). In an exercise of specific jurisdiction, a defendant that has "purposefully avail[ed]" itself of the privilege of conducting activities in a state is subject to suit in the courts of that state for claims that

"arise out of or relate to" those activities. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. ___, ___, 141 S. Ct. 1017, 1024-25 (2021) (citation and quotation marks omitted).

In support of its motion, the NCAA contended that it was not subject to general jurisdiction in Maryland "because the NCAA is an unincorporated association with its principal place of business in Indiana" and because "the NCAA is not 'essentially at home' in Maryland." Opposing the motion, Mr. Haw acknowledged that a corporation ordinarily is subject to general jurisdiction only in its state of incorporation and the state where it maintains its principal place of business. He argued, however, that a different standard should apply to an unincorporated association. He theorized that an unincorporated association should be subject to general jurisdiction in any state where its members have in-state domiciles and are subject to service of process.[4]

In reply, the NCAA argued that, with respect to general jurisdiction, the operative standard was whether it could be "considered 'at home' in Maryland." The NCAA asserted that there is nothing unique about its affiliation with Maryland. The NCAA argued that, if its affiliation with Maryland were sufficient to establish general jurisdiction, then it would be subject to suit for any and all claims in every state. The NCAA concluded that this proposed outcome was at odds with controlling precedent.

---

[4] In a footnote, Mr. Haw asserted that the NCAA could be served with process in Maryland, either through service on one person sitting on its governing board, who is a Maryland resident, or through service on one of its member institutions. Mr. Haw added: "As a courtesy, Plaintiff served the NCAA at its Indianapolis offices in this action, but if the NCAA relies on that fact to dispute personal jurisdiction, Plaintiff requests that the Court re-issue the summons so he can serve the NCAA in Maryland."

11

With respect to specific jurisdiction, the NCAA contended that Mr. Haw had failed to establish that it purposefully directed its activities at Maryland or that his claims arose out of or related to its activities that were directed at Maryland. The NCAA argued that, because the NCAA conducts its college football rulemaking activities in Indiana, those activities are not purposefully directed at member schools, athletic programs, or athletes in Maryland. The NCAA further argued that Mr. Haw had failed to establish any nexus between his claims and any NCAA contacts with Maryland. In this regard, the NCAA emphasized that the complaint included no allegations that Mr. Haw "ever played a single college football game in Maryland, or that he suffered any head injuries while playing college football in Maryland."

In response, Mr. Haw contended that the NCAA was subject to specific jurisdiction because his claims were "related to" the NCAA's activities in Maryland. Mr. Haw asserted that the NCAA "conducts extensive business in Maryland through its 20 in-state member institutions." He asserted that the NCAA derives revenue from its Maryland members, distributes revenue to some of those members, sets comprehensive rules for those members, and enforces those rules through the imposition of sanctions. In addition, he asserted that NCAA member schools recruit Maryland residents to play football at their schools and that NCAA rules govern those communications.

Mr. Haw further argued that the NCAA or its members made "specific . . . contacts" with Maryland that were related to the claims in his action. Mr. Haw asserted that "NCAA member institutions purposefully directed hundreds of communications" to him and to his parents when Rutgers University and other schools attempted to recruit

12

him to play college football.  He asserted that Rutgers entered into a contract when it sent a scholarship offer to his Maryland home, which he accepted at his Maryland high school.  He also asserted that he remained a permanent resident of Maryland while he attended college in New Jersey.  Finally, he asserted that his brain disease did not manifest itself immediately, but developed and worsened years later while he was living in Maryland.  Mr. Haw argued that these facts demonstrated that his claims were sufficiently connected to activities that the NCAA had purposefully directed at Maryland.

Along with his response, Mr. Haw provided evidence that he played at least one of his college football games in Maryland.  Specifically, he offered affidavits and exhibits showing that, on October 21, 2000, he played as a starter for the Rutgers defense in a game against the United States Naval Academy in Annapolis, Maryland.  He noted that the complaint specifically alleged that his concussive and sub-concussive injuries occurred during every football game in which he participated.[5]  He asserted, therefore, that his suit included claims for injuries that he suffered in Maryland.

In its reply to Mr. Haw's opposition to the motion to dismiss, the NCAA emphasized that it conducted its college football rulemaking activities in Indiana.  The NCAA denied the assertion that it had directed those activities at any particular state or

---

[5] The complaint states that the "most common" form of brain injury in football is a "Grade 1 concussion," in which "the athlete is not rendered unconscious and suffers momentary confusion (e.g., inattention, poor concentration, inability to process information, or sequence tasks) or mental status alterations."  Football players "commonly refer to this state as having been 'dinged' or having their 'bell rung.'"  The complaint alleges: "Brandon Haw repeatedly sustained 'dings' and/or had his 'bell rung' on many occasions in every game and practice in NCAA football.  All of these 'dings' were mild, repetitive concussive and/or sub-concussive injuries."

school.  The NCAA argued that, to establish the requisite minimum contacts between the NCAA and Maryland, Mr. Haw could not rely on the contacts made by Rutgers University or other member schools.  The NCAA also argued that, to establish the requisite contacts, Mr. Haw could not rely on his own affiliation with Maryland or the fact that his injuries affected him while living in Maryland.

E.      **Order Granting the NCAA's Motion to Dismiss**

On May 11, 2022, the circuit court conducted a hearing to consider arguments on the NCAA's motion to dismiss.  At the conclusion of the hearing, the court announced that it would grant the NCAA's motion and would dismiss the complaint.

In its oral ruling, the court first addressed whether the NCAA is subject to general personal jurisdiction in Maryland.  The court stated that "there are only three possible avenues whereby that organization could conceivably be considered 'at home'" in a forum state: where the organization "is organized," where the organization "maintains [its] principal place of business," or "in exceptional circumstances where the organization's ties to the forum are so strong and significant as compared to its other non-forum connections as to render its connection with the forum unique."  The court observed that "the NCAA unquestionably is not organized in the state of Maryland," and that "it unquestionably does not maintain its principal place of business in Maryland."  Examining the NCAA's "activities in their entirety," the court perceived no "exceptional circumstances" that might establish a unique affiliation between the NCAA and Maryland.  The court concluded that the NCAA "is not at home in a Maryland forum."

The court next addressed whether the NCAA is subject to specific personal

14

jurisdiction in Maryland in the context of this action.  The court explained that the

relevant standard was whether the NCAA maintains "minimum contacts" with Maryland

so as to make it fairly amenable to suit in this State.  The court observed that "the NCAA

certainly maintains contacts with the state of Maryland as it does with virtually every

state in the United States" where one or more of its "member institutions is located."  The

court reasoned: "at issue here is whether the alleged acts complained of were omitted or

committed in Maryland by the NCAA."  The court said that the acts alleged by Mr. Haw

"were certainly committed by an entity other than the NCAA during the recruitment

process of Mr. Haw."  The court said that it was "not convinced" that Mr. Haw had

"sufficiently shown the agency between the member institution Rutgers or any others that

may have recruited unsuccessfully Mr. Haw and the NCAA in order to establish the

NCAA having minimum contacts in Maryland."

After the hearing, the circuit court entered a written order granting the NCAA's

motion and dismissing the complaint with prejudice.

Mr. Haw filed a timely motion to alter or amend the judgment.  His motion

focused on the court's conclusion that he had failed to show an "agency" relationship

between the NCAA and its member schools.  Mr. Haw offered additional evidence of

various statements made by purported representatives of the NCAA in other contexts.  He

offered deposition testimony from a separate case, in which the NCAA President and the

NCAA Chief Medical Officer each made no distinctions between the NCAA as an entity

and its members schools.  Mr. Haw also offered written statements describing the NCAA

as a "joint venture" among its member schools: the NCAA's appellate brief to the United

15

States Supreme Court in an antitrust case; a press release written by the General Counsel and Chief Legal Officer of the NCAA; and an essay published by a law professor retained by the NCAA as an expert witness. Based on that evidence, Mr. Haw asked the court to conclude that the NCAA's contacts with Maryland were the contacts of Rutgers University and other schools that attempted to recruit him.

As an alternative to denying the motion to dismiss, Mr. Haw asked the court to vacate its dismissal order and to allow a reasonable period for jurisdictional discovery. The purpose of this requested discovery period was to allow him to seek evidence "to establish that the actions of Rutgers and other NCAA member schools, when taken in connection with NCAA-governed activities such as college football, are in fact the actions of the NCAA[.]"

The NCAA opposed the motion to alter or amend the judgment. The NCAA argued that Maryland law (as well as Indiana law) treats unincorporated associations as legal entities separate from their members. The NCAA argued that Rutgers University did not act as an agent of the NCAA when it recruited Mr. Haw and, therefore, that the actions of Rutgers in Maryland could not be attributed to the NCAA. According to the NCAA, therefore, any additional discovery on that matter was unnecessary.

The circuit court denied Mr. Haw's motion to alter or amend the judgment, without issuing an additional statement of reasons. Within 30 days after the entry of the order denying his motion to alter or amend, Mr. Haw filed a notice of appeal.

16

In this appeal, Mr. Haw contends that the circuit court erred when it granted the NCAA's motion to dismiss for lack of personal jurisdiction. He asks this Court to reverse the judgment and to remand this case for further proceedings.

In his brief, Mr. Haw presents two questions. First, Mr. Haw asks whether the circuit court erred when it concluded that it lacked specific personal jurisdiction over the NCAA. Second, Mr. Haw asks whether the circuit court erred when it concluded that it lacked general personal jurisdiction over the NCAA.[6]

---

[6] As formulated in Mr. Haw's brief, the questions presented are:

1. Whether the trial court erred by concluding that it lacked specific personal jurisdiction over the NCAA, an unincorporated association with Maryland members that sponsor NCAA football programs, where the NCAA and its member institutions:

- recruited Haw in Maryland to play college football, including by directing communications to him and his father in Maryland;
- required Haw while he was in Maryland to meet NCAA educational standards;
- entered into a contract with Haw in Maryland to play NCAA college football;
- failed to inform Haw while he was in Maryland of the dangers of playing NCAA college football;
- failed to protect Haw from serious head impacts during football practices and games, including at least one that occurred in Maryland; and
- caused Haw's neurogenerative brain disease that developed while Haw lived in Maryland.

2. Whether the trial court erred by concluding that it lacked general personal jurisdiction over the NCAA, an unincorporated association with 20 member institutions in Maryland and at least one board member who is subject to service of process in Maryland.

"The defense of lack of personal jurisdiction ordinarily is collateral to the merits and raises questions of law." *Bond v. Messerman*, 391 Md. 706, 718 (2006). Once the issue of personal jurisdiction has been raised, the plaintiff bears the burden of alleging and proving a factual basis for the exercise of personal jurisdiction. *See Pinner v. Pinner*, 467 Md. 463, 477 (2020); *CSR, Ltd. v. Taylor*, 411 Md. 457, 467 n.2 (2009). To satisfy that burden, the plaintiff must make at least a prima facie showing of facts justifying the exercise of personal jurisdiction over the defendant. *See Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1, 12 (2005); *Swarey v. Stephenson*, 222 Md. App. 65, 104 (2015). On appeal, this Court reviews the grant of a motion to dismiss for lack of personal jurisdiction "to determine whether the trial court was legally correct in its decision to dismiss the action." *Kortobi v. Kass*, 410 Md. 168, 175 (2009) (citing *Bond v. Messerman*, 391 Md. at 718-19).

The determination of whether a Maryland court may exercise personal jurisdiction over an out-of-state defendant "involves dual and overlapping considerations." *Pinner v. Pinner*, 467 Md. at 479. The exercise of jurisdiction must be authorized by the State's long-arm statute, and it must comport with the constitutional guarantee of due process. *Bond v. Messerman*, 391 Md. at 721 (citing *Mackey v. Compass Marketing, Inc.*, 391 Md. 117, 129-30 (2006)). Maryland courts have construed the long-arm statute "'to authorize the exercise of personal jurisdiction to the full extent allowable under the Due Process Clause'" of the Fourteenth Amendment to the United States Constitution. *CSR, Ltd. v. Taylor*, 411 Md. at 473 (quoting *Bond v. Messerman*, 391 Md. at 721). Thus, if the exercise of personal jurisdiction would violate the guarantee of due process, Maryland

18

courts must "construe [the] long-arm statute as not authorizing the exercise of personal jurisdiction over the defendant." *Bond v. Messerman*, 391 Md. at 721. Because "the reach of the long arm statute is coextensive with" the limits created by the Due Process Clause, "our statutory inquiry" ordinarily "merges with our constitutional examination." *Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. at 22.

Maryland's long-arm statute is codified at Md. Code (1974, 2020 Repl. Vol.), § 6-103 of the Courts and Judicial Proceedings Article. Mr. Haw contends that three subsections authorize personal jurisdiction in this case. Each subsection authorizes personal jurisdiction when a defendant engages in specified conduct either "directly or by an agent[.]" *Id.* § 6-103(b). He cites § 6-103(b)(1), which authorizes personal jurisdiction over a defendant who "[t]ransacts any business or performs any character of work or service in the State[.]" He cites § 6-103(b)(3), which authorizes personal jurisdiction over a defendant who "[c]auses tortious injury in the State by an act or omission in the State[.]" He also cites § 6-103(b)(4), which authorizes personal jurisdiction over a defendant who "[c]auses tortious injury in the State or outside of the State by an act or omission outside the State if he regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the State[.]" In its motion to dismiss, the NCAA made no argument based on the language of these provisions. The NCAA asserted that, "rather than parsing the long-arm statute to ascertain whether a defendant is subject to personal jurisdiction, Maryland courts may simply ask whether the exercise of personal jurisdiction would comport with the

19

requirements of due process."

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law[.]" The United States Supreme Court has long held that the Due Process Clause limits a state court's authority to exercise jurisdiction over a nonresident. *See, e.g.*, *Walden v. Fiore*, 571 U.S. 277, 283 (2014). Consistent with these limits, "a State may authorize its courts to exercise personal jurisdiction over an out-of-state defendant if the defendant has 'certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (further citation and quotation marks omitted).

The United States Supreme Court has "recognized two types of personal jurisdiction: 'general' (sometimes called 'all-purpose') jurisdiction and 'specific' (sometimes called 'case-linked') jurisdiction." *Bristol-Myers Squibb Co. v. Superior Court of California*, 582 U.S. 255, 262 (2017). Where applicable, general jurisdiction "extends to 'any and all claims' brought against a defendant[,]" regardless of whether those claims "relate to the forum State or the defendant's activity there[.]" *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. ___, ___, 141 S. Ct. 1017, 1024 (2021) (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. at 919). Yet "[o]nly a select 'set of affiliations with a forum' will expose a defendant to such sweeping jurisdiction." *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592

20

U.S. at ___, 141 S. Ct. at 1024 (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)). A defendant is subject to general jurisdiction in a state "only when [the] defendant is 'essentially at home' in the State." *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1024 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. at 919).

"Specific jurisdiction is very different" from general jurisdiction. *Bristol-Myers Squibb Co. v. Superior Court of California*, 582 U.S. at 262. In order for a state court to exercise specific jurisdiction over a nonresident defendant, the defendant "must take 'some act by which [it] purposefully avails itself of the privilege of conducting activities within the forum State.'" *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1024 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). In addition, the claims "must 'aris[e] out of or relat[e] to the defendant's contacts'" with the state. *Bristol-Myers Squibb Co. v. Superior Court of California*, 582 U.S. at 262 (quoting *Daimler AG v. Bauman*, 571 U.S. at 127) (further citation and quotation marks omitted). This type of personal jurisdiction may reach defendants who may not have close affiliations to a state, "but only as to a narrower class of claims." *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1024.

As the circuit court did, we will address Mr. Haw's contention that the NCAA is subject to general jurisdiction in Maryland before addressing his contention that the NCAA is subject to specific jurisdiction with respect to the claims in this action.

21

## I.     General Personal Jurisdiction

The United States Supreme Court has recognized that there are "instances in which . . . continuous corporate operations within a state" are "so substantial and of such a nature as to justify suit against [a corporation] on causes of action arising from dealings entirely distinct from those activities." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945). "When a State exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum, the State has been said to be exercising 'general jurisdiction' over the defendant." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.9 (1984).

"[O]nly a limited set of affiliations" between a defendant and a state will make the defendant subject to general jurisdiction in the state. *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014). "For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile[.]" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924 (2011). "[F]or a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home." *Id.* "The 'paradigm' forums in which a corporate defendant is 'at home,' . . . are the corporation's place of incorporation and its principal place of business." *BNSF Railway Co. v. Tyrrell*, 581 U.S. 402, 413 (2017). "Those affiliations have the virtue of being unique—that is, each ordinarily indicates only one place—as well as easily ascertainable." *Daimler AG v. Bauman*, 571 U.S. at 137. The Court has also recognized that, "in an exceptional case, a corporation's operations in a forum other than its formal place of incorporation or principal place of business may be so substantial and of such a nature as to render the corporation at home

22

in that State." *Id.* at 139 n.19 (citation omitted).[7] The "constraint described in *Daimler* . . . applies to all state-court assertions of general jurisdiction over nonresident defendants" and "does not vary with the type of claim asserted or business enterprise sued." *BNSF Railway Co. v. Tyrrell*, 581 U.S. at 414.

In *Daimler*, the Court reasoned that "[a] corporation that operates in many places can scarcely be deemed at home in all of them." *Daimler AG v. Bauman*, 571 U.S. at 139 n.20. The Court rejected a formulation that would "approve the exercise of general jurisdiction in every State in which a corporation 'engages in a substantial, continuous, and systematic course of business.'" *Id.* at 138. The Court concluded that this proposed formulation was "unacceptably grasping." *Id.* Similarly, the Court rejected a formulation that would "subject foreign corporations to general jurisdiction whenever they have an in-state subsidiary or affiliate," reasoning that this outcome "would sweep beyond even [a] 'sprawling view of general jurisdiction'" that the Court had previously rejected. *Id.* at 136.[8] The Court held that the relevant inquiry "is not whether a foreign

---

[7] In *Daimler AG v. Bauman*, 571 U.S. at 139 n.19, the Court explained that an "exceptional case" is *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952). The defendant in *Perkins* was a mining company incorporated under the laws of the Philippines. *Id.* at 439. The company had suspended its mining operations in the Philippines during World War II. *Id.* at 447. The company's president relocated to Ohio, where he operated an office in which he supervised "the necessarily limited wartime activities of the company." *Id.* at 447-48. "In those circumstances, Ohio was the corporation's principal, if temporary, place of business so that Ohio jurisdiction was proper even over a cause of action unrelated to the activities in the State." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779 n.11 (1984).

[8] The Court had previously rejected what it called a "sprawling view of general jurisdiction" under which "any substantial manufacturer or seller of goods would be

23

corporation's in-forum contacts can be said to be in some sense 'continuous and systematic,' it is whether that corporation's 'affiliations with the State are so "continuous and systematic" as to render [it] essentially at home in the forum State.'" *Id.* at 138-39 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. at 919).

As mentioned previously, the NCAA is an unincorporated association, not a corporation. Other courts, however, have concluded that the *Daimler* test applies not only to corporations but also to unincorporated associations. *E.g.*, *Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 332 (2d Cir. 2016) (explaining that "*Daimler*'s reasoning was based on an analogy to general jurisdiction over individuals, and there is no reason to invent a different test for general personal jurisdiction depending on whether the defendant is an individual, a corporation, or another entity").

The NCAA argues that the *Daimler* framework should apply to "an organization." In the NCAA's view, "an organization may be considered at home for jurisdictional purposes" in only three places: where it is organized; where it maintains its principal place of business; and, in exceptional cases, where its operations are so substantial and of such a nature as to render the organization essentially at home in the state.

The NCAA argues that, under this proposed adaptation of the *Daimler* framework, the NCAA cannot be considered "at home" in Maryland. The NCAA observes that it is not organized under Maryland law and that its principal place of business is Indianapolis, Indiana, the location of its headquarters. The NCAA asserts that Mr. Haw has never

---

amenable to suit, on any claim for relief, wherever its products are distributed."
*Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. at 929.

demonstrated or even argued that the NCAA has exceptionally strong connections to Maryland that might render it essentially "at home" in this State. The NCAA concludes, therefore, that it is not subject to general jurisdiction in Maryland courts.

In his appellate brief, Mr. Haw makes no attempt to argue that the NCAA has any type of affiliation with Maryland equivalent to one that would make a corporation subject to general jurisdiction here. Instead, Mr. Haw points out that "neither the [United States] Supreme Court nor Maryland appellate courts have decided where unincorporated associations are at home." Mr. Haw proposes: "This Court should hold that unincorporated associations like the NCAA are at home where their member institutions have in-state domiciles and can be served with process[.]"

According to Mr. Haw, two United States Supreme Court opinions support his position. First, Mr. Haw cites *C.T. Carden v. Arkoma Associates*, 494 U.S. 185 (1990). The *Carden* opinion does not concern personal jurisdiction; rather, it concerns the subject matter jurisdiction of the federal courts. Under Article III of the United States Constitution, the judicial power of the federal courts extends to "Controversies . . . between Citizens of different States." Congress has granted the federal district courts original jurisdiction in actions where the amount in controversy exceeds a designated statutory minimum and the controversy is between "citizens of different States[.]" 28 U.S.C. § 1332(a)(1). The Supreme Court has consistently interpreted this statute "to require 'complete diversity' of citizenship." *Carden v. Arkoma Assocs.*, 494 U.S. at 187 (citing *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267 (1806)). In other words, this statute will not confer subject matter jurisdiction on a federal district court "unless *each*

25

defendant is a citizen of a different State from *each* plaintiff." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S. 365, 373 (1978) (emphasis in original).

In *Carden*, the Court considered "whether, in a suit brought by a limited partnership, the citizenship of the limited partners must be taken into account to determine diversity of citizenship among the parties." *Carden v. Arkoma Assocs.*, 494 U.S. at 186. The Court observed that it had previously "held that a corporation is 'capable of being treated as a citizen of [the State which created it], as much as a natural person.'" *Id.* at 188 (quoting *Louisville, C. & C.R. Co. v. Letson*, 43 U.S. (2 How) 497, 558 (1844)). The Court stated that, "[w]hile the rule regarding the treatment of corporations as 'citizens' has become firmly established," the Court has "just as firmly resisted extending that treatment to other entities[,]" such as "an unincorporated 'joint stock company'" or "a 'limited partnership association[.]'" *Carden v. Arkoma Assocs.*, 494 U.S. at 189 (citations omitted). In what the Court characterized as a "technical, precedent-bound" outcome (*id.* at 196), the Court "reject[ed] the contention that to determine, for diversity purposes, the citizenship of an artificial entity, the court may consult the citizenship of less than all of the entity's members." *Id.* at 195. Thus, the Court held that diversity of citizenship in an action by or against an unincorporated artificial entity "depends on the citizenship of 'all the members'" of the entity. *Id.* (quoting *Chapman v. Barney*, 129 U.S. 677, 682 (1889)); *accord Americold Realty Trust v. Conagra Foods, Inc.*, 577 U.S. 378, 381 (2016).

Contrary to Mr. Haw's arguments, the *Carden* opinion does not endorse a proposition that an unincorporated association is subject to general personal jurisdiction

26

wherever its members "have in-state domiciles[.]" Limits on the subject matter jurisdiction of the federal courts should not be confused with limits on the personal jurisdiction of state courts. "Subject-matter jurisdiction . . . is an Art. III as well as a statutory requirement; it functions as a restriction on federal power[.]" *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinée*, 456 U.S. 694, 702 (1982). "The requirement that a court have personal jurisdiction flows not from Art. III, but from the Due Process Clause." *Id.* "The personal jurisdiction requirement . . . represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty." *Id.* It would be a mistake to equate a party's citizenship within the meaning of the diversity jurisdiction statute with the party's domicile (or equivalent) for the purpose of assessing whether the party is subject to general jurisdiction. In fact, as the NCAA points out, Maryland appellate courts have previously rejected the reading of *Carden* proposed by Mr. Haw.

In *Mission West Properties, L.P. v. Republic Properties Corp.*, 162 Md. App. 17 (2005), *aff'd*, 391 Md. 732 (2006), this Court analyzed whether a Maryland court could exercise general jurisdiction over a Delaware limited partnership that had its principal place of business in Cupertino, California. *Id.* at 28-29; *id.* at 37 n.12. The plaintiffs contended that the partnership was domiciled in Maryland because its general partner was a corporation organized under Maryland law. *Id.* at 26. The plaintiffs "relie[d] heavily" on *Carden*, "in which the Supreme Court held that, to determine a partnership's citizenship for purposes of federal diversity jurisdiction, under 28 U.S.C. § 1332(a), federal courts must include in their analysis the state citizenship of each of the limited

27

and general partners constituting the partnership." *Mission West Props., L.P. v. Republic Props. Corp.*, 162 Md. App. at 29. This Court explained, however, that "'*Carden* involves the interpretation of a federal statute . . . which defines federal diversity of citizenship jurisdiction.'" *Id.* (quoting *Lurie v. 8182 Maryland Assocs.*, 938 P.2d 676, 679 (Mont. 1997)). State trial courts "'do not apply diversity of citizenship principles in order to determine jurisdiction[;] [r]ather they apply [state] statutory law and the "minimum contacts" principles enunciated in *International Shoe Co. v. Washington*[.]'" *Mission West Props., L.P. v. Republic Props. Corp.*, 162 Md. App. at 29 (quoting *Lurie v. 8182 Maryland Assocs.*, 938 P.2d at 679).

On further appellate review, the plaintiffs again argued that, under *Carden*, "the jurisdictional domicile of a limited partnership is the domicile of its partners[.]" *Republic Props. Corp. v. Mission West Props., LP*, 391 Md. 732, 745 (2006). The State's highest court rejected their argument, explaining: "[T]he Supreme Court, in *C.T. Carden*, was addressing only whether an artificial entity may be considered a 'citizen' of the state under whose laws it was created with regard to subject matter jurisdiction, in the context specifically of determining diversity jurisdiction in federal courts." *Id.* "Therefore," the Court concluded that the *Carden* opinion was "not instructive in determining the domicile of a foreign limited partnership for purposes of personal jurisdiction in Maryland's state courts." *Id.*

In sum, *Carden* does not support the theory that an unincorporated association is subject to general personal jurisdiction wherever its members have in-state domiciles. *Carden* restricts the subject matter jurisdiction of federal courts over cases involving

unincorporated associations; it does nothing to expand the ability of state courts to assert personal jurisdiction over unincorporated associations. Moreover, *Carden* does not exempt unincorporated associations from the principle that "all assertions of state-court jurisdiction must be evaluated according to the standards set forth in *International Shoe* and its progeny." *Shaffer v. Heitner*, 433 U.S. 186, 212 (1977). Finally, the *Carden* opinion does not address whether a proposed rule subjecting an unincorporated association to general jurisdiction in every state where its members have domiciles would comport with "traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. at 316.

The second opinion cited by Mr. Haw is *Burnham v. Superior Court of California*, 495 U.S. 604 (1990). In *Burnham*, the Supreme Court held that the Due Process Clause did not prohibit a state court from exercising personal jurisdiction over a nonresident who was personally served with process while temporarily present in the state, for an action unrelated to his activities in that state. *Id.* at 607; *id.* at 619. Mr. Burnham, a New Jersey resident, was served with a California court summons and divorce petition while he was visiting California to conduct business and to visit his children. *Id.* at 608. Although the Justices employed different rationales, all members of the Court agreed that service of process on Mr. Burnham while he was physically present in California was a sufficient basis for the court to exercise personal jurisdiction in that action. *Id.* at 619 (plurality opinion by Scalia, J.); *id.* at 628 (concurring opinion by White, J.); *id.* at 628-29

(concurring opinion by Brennan, J.); *id.* at 640 (concurring opinion by Stevens, J.).[9]

As Mr. Haw writes in his brief, the *Burnham* Court held "that process served on an individual" physically present in a State "sufficed for personal jurisdiction over the individual." Mr. Haw argues that the *Burnham* opinion "suggest[s]" that "an unincorporated association is subject to general jurisdiction where its member institutions . . . are capable of being served with process in the forum."

Mr. Haw observes that Maryland statutes provide that a circuit court may exercise personal jurisdiction "over a person domiciled in" or "served with process in" the State. Md. Code (1974, 2020 Repl. Vol.), § 6-102(a) of the Courts and Judicial Proceedings Article. Mr. Haw further observes that, under the Maryland Rules, service of process may be made on an unincorporated association "by serving any officer or member of its governing board." Md. Rule 2-124(i). "If there are no officers or if the association has no governing board, service may be made upon any member of the association." *Id.* Mr. Haw notes that "at least one member of the NCAA's governing board (the president of

---

[9] The principal plurality opinion, written by Justice Scalia, focused on state court decisions before and after the adoption of the Fourteenth Amendment holding that "personal service upon a physically present defendant sufficed to confer jurisdiction, without regard to whether the defendant was only briefly in the State, or whether the cause of action was related to his activities there." *Burnham v. Superior Court of California*, 495 U.S. at 612. Justice Scalia and three other Justices concluded that "jurisdiction based on physical presence alone constitutes due process because it is one of the continuing traditions of our legal system[.]'" *Id.* at 619. In a concurring opinion, Justice Brennan and three other Justices agreed that the Due Process Clause "generally permits a state court to exercise jurisdiction over a defendant if [the defendant] is served with process while voluntarily present in the forum State." *Id.* at 628-29 (Brennan, J., concurring). Justice Brennan reasoned that "[t]radition . . . alone" was not dispositive and that all assertions of personal jurisdiction "must comport with contemporary notions of due process." *Id.* at 632-33 (Brennan, J., concurring).

Morgan State [University]), is a Maryland resident[.]" Mr. Haw further notes that the NCAA has 20 member institutions in Maryland. Mr. Haw concludes that the NCAA, therefore, "is subject to service of process in Maryland."

Mr. Haw acknowledges that he did not, in fact, serve a summons on a member of the NCAA's governing board or any other person or entity in Maryland. Mr. Haw admits that he served the NCAA at its primary offices in Indianapolis, Indiana. Mr. Haw informs us that, in a footnote to his opposition to the motion to dismiss, he requested that the circuit court "re-issue the summons so he c[ould] serve the NCAA in Maryland," if the NCAA "relie[d]" on the lack of in-state service.

By its own terms, Mr. Haw's conditional request that the court re-issue a summons was inapplicable. The NCAA has never "rel[ied]" on lack of in-state service or otherwise disputed the sufficiency of service of process. Rather, Mr. Haw now seeks to affirmatively rely on in-state service (which did not occur) as a potential basis for acquiring personal jurisdiction.

In any event, even if Mr. Haw had effected service inside Maryland, that fact alone would not be enough to confer general jurisdiction over the NCAA. When a nonresident entity is "properly served with process in Maryland (as far as Maryland law is concerned)" and § 6-102 of the Courts and Judicial Proceedings Article "purports to grant Maryland courts general jurisdiction" over the entity, "our inquiry does not end there." *Mission West Props., L.P. v. Republic Props. Corp.*, 162 Md. App. at 30. A purely "'[l]iteral application of § 6-102(a) might . . . permit jurisdiction under circumstances that would offend due process.'" *Id.* (quoting John A. Lynch & Richard

31

W. Bourne, *Modern Maryland Civil Procedure* § 3.3, at 3-34 (2d ed. 2004)). Similarly, service of process on a foreign entity in a manner prescribed by Md. Rule 2-124 "does not confer, by itself, personal jurisdiction" over the foreign entity. *Republic Props. Corp. v. Mission West Props., LP*, 391 Md. at 747-48. Maryland Rule 2-124 "does not delimit the jurisdictional limits of Maryland courts, but rather serves as part of the service of process rules that define the procedural requirements that enable a Maryland court to obtain jurisdiction over a defendant *where constitutionally permitted*." *Id.* at 747 (emphasis added).

Although *Burnham* recognized the continuing validity of obtaining personal jurisdiction based on a person's physical presence in a state, this holding "was confined to circumstances where service of process was made upon a natural person who was personally within the forum state when served." *Republic Props. Corp. v. Mission West Props., LP*, 391 Md. at 748-49 (citing *Mission West Props., L.P. v. Republic Props. Corp.*, 162 Md. App. at 38 n.13)). Maryland appellate courts have concluded that this holding does not extend to corporations or other entities. Generally, "in-state service upon an individual authorized (in fact and law) to receive service for a corporation *does not* vest the state's courts with general personal jurisdiction over the corporation when the corporation has no other contacts with the state." *Mission West Props., L.P. v. Republic Props. Corp.*, 162 Md. App. at 31 (emphasis in original). With respect to a foreign corporation, "'service of process, in Maryland, upon a resident agent appointed by a foreign corporation will subject the corporation to State court jurisdiction if, in addition to the fact, and validity, of that service, it is shown that the corporation has

32

sufficient contact with the State to make it constitutionally subject to suit here.'"

*Republic Props. Corp. v. Mission West Props., LP*, 391 Md. at 759 (quoting *Springle v. Cottrell Eng'g Corp.*, 40 Md. App. 267, 288 (1978)). Maryland courts have "perceive[d] no substantial reason to treat a foreign limited partnership"—one type of unincorporated entity—"differently" from a corporation in this regard. *Republic Props. Corp. v. Mission West Props., LP*, 391 Md. at 759; *see also Mission West Props., L.P. v. Republic Props. Corp.*, 162 Md. App. at 34-38. By extension, we see no reason to treat an unincorporated association differently from a corporation or partnership for this purpose.

In his brief, Mr. Haw notes that the lead plurality opinion in *Burnham* "expressly criticized a Third Circuit case that had held that jurisdiction could not be established over unincorporated associations by service on the association's agent in the forum." This statement is accurate, but it fails to apprehend the meaning of the Court's criticism. The *Burnham* plurality expressly criticized a number of opinions "that erroneously said . . . that [the Supreme Court's] due process decisions render[ed] the practice" of in-state personal service on an out-of-state resident "unconstitutional." *Burnham v. Superior Court*, 495 U.S. at 615 (citing portions of five opinions including *Nehemiah v. Athletics Congress of U.S.A.*, 765 F.2d 42, 46-47 (3d Cir. 1985)).

In the cited portion of its opinion, the Third Circuit stated: "It is arguable that the transient presence basis for jurisdiction over any defendant, including any individual, is no longer viable." *Nehemiah v. Athletics Congress of U.S.A.*, 765 F.2d at 46. Perceiving what it called the Supreme Court's "reexamination of some of the traditional underpinnings of jurisdiction[,]" the Third Circuit reasoned that "it is difficult to find a

33

basis in logic and fairness to conclude" that the "fleeting physical presence of a non-resident person can support personal jurisdiction." *Id.* at 47 (discussing *Shaffer v. Heitner*, 433 U.S. 186 (1977)). As we understand *Burnham*, the lead plurality opinion criticized *Nehemiah* and other opinions to the extent that those opinions concluded that in-state personal service on an individual was no longer sufficient to confer jurisdiction over that individual. These criticisms do not reach the issue of how an unincorporated association should be treated for the purpose of establishing personal jurisdiction. *See Republic Props. Corp. v. Mission West Props., LP*, 391 Md. at 749 (explaining that "*Burnham* was confined to circumstances where service of process was made upon a natural person who was personally within the forum state when served").[10]

In sum, we see no error in the circuit court's conclusion that the NCAA is not subject to general personal jurisdiction in Maryland. Mr. Haw has not demonstrated that the NCAA is "'essentially at home'" in Maryland. *Daimler AG v. Bauman*, 571 U.S. at 127 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. at 919). The theory that an unincorporated association should be subject to general jurisdiction wherever its members have in-state domiciles or wherever its members can be served with process is unfounded.

---

[10] Mr. Haw cites a law review article arguing that the *Burnham* holding should be expanded to authorize personal jurisdiction based on in-state service on officers of corporations and other entities: Cody J. Jacobs, *If Corporations are People, Why Can't They Play Tag?*, 46 N.M. L. REV. 1 (2016). Even if we were to consider these criticisms, this Court would not be at liberty to disregard the *Republic Properties* opinion. *See, e.g., Scarborough v. Altstatt*, 228 Md. App. 560, 577-78 (2016).

## II. Specific Personal Jurisdiction

In his primary challenge to the judgment, Mr. Haw contends that the circuit court erred when it concluded that the NCAA was not subject to specific personal jurisdiction in this action. He argues that either the NCAA's members or the NCAA itself purposefully directed activities at Maryland and that his claims are sufficiently connected to those activities to establish specific jurisdiction.

For a Maryland court to exercise personal jurisdiction over a nonresident defendant, the defendant "must have 'minimum contacts' with Maryland, such that the exercise of personal jurisdiction in Maryland 'does not offend traditional notions of fair play and substantial justice.'" *Kortobi v. Kass*, 410 Md. 168, 185 (2009) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (further citation and quotation marks omitted). In the category of specific jurisdiction, the required contacts "often go by the name 'purposeful availment.'" *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. ___, ___, 141 S. Ct. 1017, 1024 (2021) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)). "'[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within [the State], thus invoking the benefits and protections of its laws.'" *Kortobi v. Kass*, 410 Md. at 185 (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). In addition, "'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the forum.'" *Bristol-Myers Squibb Co. v. Superior Court of California*, 582 U.S. 255, 262 (2017) (emphasis in original) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)).

"The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant 'focuses on the relationship among the defendant, the forum, and the litigation.'" *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984)) (further citation and quotation marks omitted). This inquiry may be organized into three prongs. *See, e.g.*, *Pinner v. Pinner*, 467 Md. 463, 481 (2020); *Beyond Sys., Inc. v. Realtime Gaming Holding Co.*, 388 Md. 1, 26 (2005). Specific jurisdiction exists if it can be demonstrated that: (1) the defendant has purposefully directed its activities at residents of the forum; (2) the plaintiff's claims arise out of or relate to those activities directed at the state; and (3) the exercise of personal jurisdiction would be constitutionally reasonable. *Stisser v. SP Bancorp, Inc.*, 234 Md. App. 593, 617 (2017) (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. at 472, 476).

The "'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Burger King Corp. v. Rudzewicz*, 471 U.S. at 475 (citations omitted). To satisfy this requirement, the "contacts must be the defendant's own choice[.]" *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1025. In other words, the required contacts must be "contacts that the 'defendant *himself*' creates with the forum State." *Walden v. Fiore*, 571 U.S. at 284 (emphasis in original) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. at 475). Sufficient contacts may exist where the defendant "deliberately 'reached out beyond' its home—by, for example, 'exploi[ting] a market' in

36

the forum State or entering a contractual relationship centered there." *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1025 (quoting *Walden v. Fiore*, 571 U.S. at 285).

Specific jurisdiction doctrine is founded "on an idea of reciprocity between a defendant and a State[.]" *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1025. Where a defendant "deliberately has engaged in significant activities within a State" or has "created continuing obligations between [itself] and residents of the forum," the defendant's "activities are shielded by the benefits and protections of the forum's laws[.]" *Burger King v. Rudzewicz*, 471 U.S. at 475-76 (citations and quotation marks omitted). Consequently, "the State may hold the [defendant] to account for related misconduct." *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1025. This doctrine ensures that a defendant has "'fair warning' . . . that 'a particular activity may subject [it] to the jurisdiction of a foreign sovereign.'" *Id.* (quoting *Burger King v. Rudzewicz*, 471 U.S. at 472). This feature "allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

Even if a defendant has purposefully directed its activities at a state, the defendant is not subject to suit in that state unless there is a sufficient "connection between the forum [state] and the specific claims at issue." *Bristol-Myers Squibb Co. v. Superior Court of California*, 582 U.S. at 265. "In other words, there must be 'an affiliation between the forum and the underlying controversy, principally, [an] activity or an

37

occurrence that takes place in the forum State and is therefore subject to the State's regulation.'" *Id.* at 262 (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011)). This requirement is satisfied if the claims either "'arise out of or relate to the defendant's contacts with the forum [state].'" *See Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1026 (emphasis omitted) (quoting *Bristol-Myers Squibb Co. v. Superior Court of California*, 582 U.S. at 262).

In this appeal, Mr. Haw contends that the circuit court erred in two separate respects when it concluded that the NCAA is not subject to specific personal jurisdiction in this action. First, Mr. Haw argues that the court erred by refusing to impute or attribute the contacts of the NCAA's members (including Rutgers University) to the NCAA itself. Second, Mr. Haw argues that the court erred by failing to conclude that, even without the contacts of those members, the NCAA's own "direct contacts" with Maryland are sufficient to establish specific jurisdiction.

## A. Imputation of Contacts

In its oral ruling, the circuit court determined that Mr. Haw had failed to demonstrate an "agency" relationship that might justify his assertion that certain acts of Rutgers University and other NCAA members are the acts of the NCAA. On appeal, Mr. Haw offers a variety of legal theories under which, he argues, the acts of the NCAA's members might be imputed or attributed to the NCAA.

Throughout his briefs, Mr. Haw repeatedly asserts that the NCAA, as an unincorporated association, lacks the status of a legal entity that is distinct from its

members.  According to Mr. Haw: "Unlike a corporation or other artificial entity, which has a legal existence separate from its equity holders, the NCAA is its member institutions, both legally and factually."  (Emphasis in original.)

In response, the NCAA explains that, at least as far as Maryland law is concerned, unincorporated associations are recognized as distinct entities.  "At common law, an unincorporated association was not a separate legal entity from its members."  *Pinksy v. Pikesville Recreation Council*, 214 Md. App. 550, 570 (2013).  "Over time, however, . . . many courts and legislatures decided that [unincorporated associations] should be treated as separate legal entities from their members."  *Id.* at 571.  By the early twentieth century, Maryland's highest court "held that unincorporated associations could sue and be sued in their own names."  *Id.* (citing *Littleton v. Wells & McComas Council*, 98 Md. 453, 456 (1904)).  Later, the General Assembly enacted legislation recognizing that an unincorporated association "may sue or be sued" in its own name "on any cause of action affecting the common property, rights, and liabilities" of the association.  Md. Code (1974, 2020 Repl. Vol.), § 6-406(a) of the Courts and Judicial Proceedings Article.  In such an action, a money judgment against the unincorporated association is enforceable only against the assets of the association "as an entity, but not against the assets of any member."  *Id.* § 11-105.  Moreover, it is a "long-recognized and uncontroversial" proposition that unincorporated associations have the power to enter into contracts in their own names.  *Pinksy v. Pikesville Recreation Council*, 214 Md. App. at 573.  In short, Maryland is one of many states that "now recognize[] unincorporated associations

39

as legal entities" distinct from their members. *Id.* at 579 n.34.[11]

Mr. Haw cites no legal authority supporting the proposition that an unincorporated association has no existence separate from its members. Instead, Mr. Haw calls attention to various statements made by representatives of the NCAA. During 2022, in a deposition from a different case, the president of the NCAA stated that "[t]he schools" known as member institutions "are the NCAA." In another deposition from that same case, the NCAA's chief medical officer stated that the NCAA is "the 1100 member schools" and that the "location" of the NCAA is "in all 50 states" where those schools are located. Mr. Haw asserts that, because the NCAA "represent[ed] repeatedly that the NCAA is its members," the NCAA cannot be permitted to assert that the acts of its members are not acts of the NCAA.

Mr. Haw provides no justification for his suggestion that the statements of two NCAA representatives should displace the legal principles that would otherwise govern this action. Under certain circumstances, principles of estoppel may prohibit a party who successfully pursued a position in a prior proceeding from adopting an inconsistent position in a later proceeding. *See generally Nusbaum v. Nusbaum*, 243 Md. App. 653, 665-69 (2019) (discussing requirements of related doctrines of judicial estoppel and equitable estoppel). Nonetheless, the party who seeks to rely on estoppel "has the burden to prove the facts that create it." *Old Severna Park Improvement Ass'n, Inc. v. Barry*,

_____

[11] Indiana Trial Rule 17(E) allows an unincorporated association to sue or be sued in its own name. Under this Rule, a judgment affecting an unincorporated association binds the association "as if it were an entity," and does not bind individual members of the association. *Id.*

188 Md. App. 582, 596 (2009) (citing *Jurgensen v. New Phoenix Atl. Condo. Council of Unit Owners*, 380 Md. 106, 125 (2004)). At most, Mr. Haw has presented evidence that certain NCAA employees made statements in connection with another case that appear to be inconsistent with the NCAA's present position. This evidence does not even show what position on this issue, if any, the NCAA itself pursued as a party in that case. This evidence alone is nowhere near enough to establish the basic facts needed to justify estoppel.

Most of Mr. Haw's arguments accept the premise that the NCAA is a distinct legal entity, separate from its members. Mr. Haw nevertheless contends that actions of the NCAA's members can be imputed or attributed to the NCAA, on the theory that those members took those actions as agents of the NCAA. He argues that, under what he calls "[b]asic principles of agency law, . . . NCAA member institutions are agents of the NCAA for any acts conducted as part of the NCAA's business." Chiefly, Mr. Haw argues that certain actions of Rutgers University (and other NCAA member schools that attempted to recruit him) should be attributed to the NCAA. He argues that Rutgers purposefully availed itself of the privilege of conducting activities in Maryland when it sent communications to recruit him to play college football and when it entered into a contract to provide him an athletic scholarship. In his view, if these contacts are imputed to the NCAA, those contacts are sufficient to establish specific jurisdiction in this action.

At various points in its brief, the NCAA suggests that, because it should be treated as an entity distinct from its members, it cannot under any circumstances be "charged" with the contacts of any third party, such as one of its member institutions. Contrary to

41

this suggestion, "[i]mputation, or attribution, of jurisdictional contacts is not a new notion." *Mackey v. Compass Marketing, Inc.*, 391 Md. 117, 125 (2006). "It is long-established that personal jurisdiction may be exercised over a nonresident defendant on the basis of the actions of the nonresident defendant's agent." *Id.*; *see also Pinner v. Pinner*, 467 Md. 463, 490 (2020) (recognizing that "an agent's conduct can give rise to personal jurisdiction over a principal"). The United States Supreme Court continues to recognize that "[a]gency relationships . . . may be relevant to the existence of specific jurisdiction," such as when a party "purposefully avail[s] itself of a forum by directing its agents or distributors to take action there." *Daimler AG v. Bauman*, 571 U.S. 117, 135 n.13 (2014) (emphasis omitted); *see also Walden v. Fiore*, 571 U.S. 277, 285 (2014) (stating that entry into a state "through an agent . . . is certainly a relevant contact"). The "mere fact" that the NCAA and its members "are 'separate entities' does not establish that [an NCAA member] may not be the agent of [the NCAA]." *Lewron Television, Inc. v. Int'l Alliance of Theatrical Stage Emps.*, 37 Md. App. 662, 671-72 (1977).

When a plaintiff seeks to establish specific personal jurisdiction over a defendant based on the contacts of an alleged agent, the plaintiff bears the burden of showing that an agency relationship exists. *See Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1, 26 (2005). "An agency relationship 'is a legal concept which depends upon the existence of required factual elements: the manifestation [of consent] by the principal that the agent shall act for him, the agent's acceptance of the undertaking and the understanding of the parties that the principal is to be in control of the undertaking.'" *Id.* (quoting Restatement (Second) of Agency § 1, cmt. (1958)). Factors relevant to

42

determining whether an agency relationship exist include: "'(1) [t]he agent's power to alter the legal relations of the principal; (2) [t]he agent's duty to act primarily for the benefit of the principal; and (3) [t]he principal's right to control the agent.'" *Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. at 27 (quoting *Green v. H & R Block, Inc.*, 355 Md. 488, 503 (1999)).[12]

As the NCAA correctly observes, Mr. Haw has not demonstrated the existence of an agency relationship between the NCAA and its member institutions under this test. The record does not support a conclusion that Rutgers University was acting on behalf of the NCAA when it recruited Mr. Haw to play college football at Rutgers and offered him a scholarship. Nothing in the affidavit from Mr. Haw's father indicates that Rutgers or other members schools held themselves out to be representatives of the NCAA. The two recruitment letters introduced as exhibits were printed under a Rutgers letterhead and signed by Rutgers coaches. One letter, from the head football coach, specifies: "On behalf of Rutgers University, I am offering you a full NCAA Grant-In-Aid scholarship[.]" The other letter, addressed to Mr. Haw's parents, discusses "our offer" of a scholarship, "our commitment" to Mr. Haw, and what his acceptance would mean for "our football program"—statements uniformly referring to Rutgers. No reasonable reader would construe these communications as communications from or on behalf of the NCAA.

---

[12] In addition, agency relationships "come in many sizes and shapes: 'One may be an agent for some business purposes and not others so that the fact that one may be an agent for one purpose does not make him or her an agent for every purpose.'" *Daimler AG v. Bauman*, 571 U.S. at 135 (quoting 2A C.J.S. Agency § 43, at 367 (2013)).

Throughout his brief, Mr. Haw emphasizes that Rutgers offered him what is called an "NCAA scholarship." It would be wrong to grant undue significance to this label. In this context, the phrase "NCAA scholarship" is a shorthand description for a scholarship that complies with the NCAA's rules, such as its standards regarding eligibility and the limits on financial aid and compensation that member institutions may provide to student-athletes. Student-athletes such as Mr. Haw receive scholarships and financial aid from the member institutions themselves, not from the NCAA. *See, e.g.*, 2022-23 NCAA Division I Manual, Operating Bylaws, Art. 15 (setting forth limits on financial aid that member institutions may provide to student-athletes). The scholarship agreement between Rutgers and Mr. Haw did not obligate the NCAA itself to provide him with a scholarship.

Mr. Haw also emphasizes that Rutgers recruited him to play what is known as "NCAA football." Again, however, this description does not transform the recruitment communications of Rutgers into acts of the NCAA. The express purpose of the recruitment letters was to solicit Mr. Haw's "commitment to attend Rutgers" and to join "[its] football program." As the NCAA explains in its brief, NCAA member institutions compete against each other to recruit the best student-athletes to join their respective athletic programs. *Accord Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. ___, ___, 141 S. Ct. 2141, 2154 (2021) (stating that NCAA member schools "compete fiercely for student-athletes but remain subject to NCAA-issued-and-enforced limits on what compensation they can offer"). Nothing in the record indicates that the NCAA mandates or directs this recruitment process. Rather, the NCAA's role is to establish and enforce

44

uniform rules governing the "recruitment of a student-athlete by a member institution[.]" *See* 2022-23 NCAA Division I Manual, Operating Bylaws, Art. 13.

To some extent, Mr. Haw attempts to rely on the mere fact of NCAA membership to create a presumption of agency. He cites the proposition that, under certain circumstances, an unincorporated association "*may be* liable for the torts of one of its individual members[.]" *Rubin v. Weissman*, 59 Md. App. 392, 406-07 (1984) (emphasis added) (citing 7 C.J.S. Associations §§ 31, 38). According to Mr. Haw, "[i]t follows" from this proposition "that the acts of the association's members within the scope of the association's mission are acts of the association." To the contrary, the statement from *Rubin v. Weissman* is little more than a recognition that, under certain circumstances, members of an association might be authorized to act on behalf of the association. This proposition does not establish that all members of an association are deemed to act as agents of the association whenever they might be said to be acting in the scope of the association's general mission. *Cf. Lewron Television, Inc. v. Int'l Alliance of Theatrical Stage Emps.*, 37 Md. App. at 673 (reasoning that international labor union was not subject to personal jurisdiction based on contacts of a local affiliate, because the "connection between them" did not "render the local a mere arm of the International, whereby the local's activities and those of the International" could "properly be considered one and the same").

Mr. Haw theorizes that the NCAA is "a particular type of unincorporated association; namely a joint venture" between its members. He argues that, where a joint venture has been created, each participant is considered to be an agent of the joint venture

when acting in furtherance of the venture's common objective.  Mr. Haw further argues that, under Maryland law, joint ventures are governed by the substantive law of partnerships.  *See Seaboard Surety Co. v. Richard F. Kline, Inc.*, 91 Md. App. 236, 247 (1992).  Under the Maryland Revised Uniform Partnership Act, "[e]ach partner is an agent of the partnership for the purpose of its business."  Md. Code (1974, 2014 Repl. Vol.), § 9A-301 of the Corporations and Associations Article.  Under this theory, Mr. Haw concludes that the acts of NCAA member schools are attributable to the NCAA if those acts "were taken within the scope of college football."

Notably absent from this argument is any showing that the NCAA satisfies any definition of a "joint venture" under the law of Maryland or any other state.  "Under Maryland law, a joint venture . . . 'has been defined as [a]n association of two or more persons to carry out a single business enterprise for profit, and as a partnership for a single transaction.'"  *Seaboard Surety Co. v. Richard F. Kline, Inc.*, 91 Md. App. at 247 (quoting *Herring v. Offutt*, 266 Md. 593, 596-97 (1972)) (further citation and quotation marks omitted).  "A joint venture is created when 'two or more persons combine in joint business enterprise for their mutual benefit with the understanding that they are to share in profits and losses and each is to have voice in its management.'"  *Finch v. Hughes Aircraft Co.*, 57 Md. App. 190, 236 (1984) (emphasis omitted) (quoting *Brenner v. Plitt*, 182 Md. 348, 355 (1943)).  "Whether or not a joint venture exists depends upon the intentions of the parties which is to be determined from the facts of the case and in accordance with ordinary rules governing interpretation of contracts."  *Finch v. Hughes Aircraft Co.*, 57 Md. App. at 236.

46

Mr. Haw's assertion that the NCAA is a "joint venture" is not founded on the satisfaction of any recognized definition or test. Rather, Mr. Haw relies on evidence that the NCAA "regularly describes itself" as a joint venture. He cites statements from a brief submitted by the NCAA to the United States Supreme Court in connection with an antitrust case.[13] In that case, former student-athletes alleged that the NCAA violated antitrust law by establishing rules to limit the compensation that member schools may provide to student-athletes. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. ___, ___, 141 S. Ct. 2141, 2147 (2021). The NCAA urged the courts to review those compensation restrictions under a highly deferential "'quick look'" standard, arguing that the NCAA "is a joint venture and that collaboration among its members is necessary if they are to offer consumers the benefit of intercollegiate athletic competition." *Id.* at ___, 141 S. Ct. at 2155. The Supreme Court "assum[ed] (without deciding) that the NCAA is a joint venture," but concluded that, even if the NCAA is a joint venture, the NCAA's rules limiting compensation of student-athletes were subject to review under the less deferential "rule of reason" standard. *Id.* at ___, 141 S. Ct. at 2155-57.

Mr. Haw's brief fails to explain his suggestion that the NCAA's stated position in this antitrust case controls the jurisdictional issues in the present case. In his reply brief, citing *Nusbaum v. Nusbaum*, 243 Md. App. 653, 666 (2019), Mr. Haw alludes to the doctrine of judicial estoppel, also known as estoppel by admission or the doctrine against

---

[13] Mr. Haw also cites an article written by the NCAA's general counsel, who described the NCAA as a "wholly integrated joint venture among schools." The article concerns the outcome of the United States Supreme Court's decision in the same antitrust case.

inconsistent positions. Generally, the doctrine of judicial estoppel "prevents 'a party who *successfully* pursued a position in a prior legal proceeding from asserting a contrary position in a later proceeding.'" *Id.* (emphasis added) (quoting *Roane v. Washington Cnty. Hosp.*, 137 Md. App. 582, 592 (2001)) (further quotation marks omitted). Judicial estoppel may be applied where three circumstances exist: "'(1) one of the parties takes a [ ] position that is inconsistent with a position it took in previous litigation, (2) the previous inconsistent position was accepted by a court, and (3) the party who is maintaining the inconsistent positions must have intentionally misled the court in order to gain an unfair advantage.'" *Bank of New York Mellon v. Georg*, 456 Md. 616, 654 (2017) (quoting *Dashiell v. Meeks*, 396 Md. 149, 171 (2006)).

As the party seeking to employ the doctrine of estoppel, Mr. Haw "has the burden to prove the facts that create it." *Old Severna Park Improvement Ass'n, Inc. v. Barry*, 188 Md. App. 582, 596 (2009) (citing *Jurgensen v. New Phoenix Atl. Condo. Council of Unit Owners*, 380 Md. 106, 125 (2004)). Here, Mr. Haw presented evidence showing that, in an antitrust case, the NCAA previously adopted the position that it should be regarded as a joint venture. These statements alone do not establish that the meaning of a "joint venture" for the purpose of antitrust law is identical to the definition of a "joint venture" for the purpose of assessing whether an agency relationship exists. Thus, Mr. Haw has not established that the NCAA's present position is "'clearly inconsistent' with its earlier position[,]" as required to create judicial estoppel. *Vogel v. Touhey*, 151 Md. App. 682, 708 (2003) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001)). Moreover, this evidence does not establish that any court adopted the position that the

48

NCAA is a joint venture or that the NCAA has misled the courts to gain an unfair advantage or to impose an unfair detriment. Indeed, the Supreme Court declined to decide whether the NCAA is a joint venture and largely rejected the NCAA's position on the merits. *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. at ___, 141 S. Ct. at 2155-57. "'Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity.'" *Vogel v. Touhey*, 151 Md. App. at 708 (quoting *New Hampshire v. Maine*, 532 U.S. at 750) (further quotation marks omitted). In sum, Mr. Haw has failed to establish the basic facts needed to justify judicial estoppel.

In another theory under which the contacts of NCAA member institutions might be attributed to the NCAA, Mr. Haw cites *Donatelli v. National Hockey League*, 893 F.2d 459 (1st Cir. 1990). In that case, the First Circuit considered whether a federal district court in Rhode Island could exercise personal jurisdiction over the National Hockey League (NHL), an unincorporated association of professional hockey teams. *Id.* at 461. The district court had concluded that, because the NHL is an unincorporated association, it was "subject to the general personal jurisdiction of every court having personal jurisdiction over one of its member clubs." *Donatelli v. Nat'l Hockey League*, 708 F. Supp. 31, 36 (D.R.I. 1989), *rev'd*, 893 F.2d 459 (1st Cir. 1990). The First Circuit rejected this "categorical approach," and instead adopted "a functional, flexible, case-specific methodology." *Donatelli v. Nat'l Hockey League*, 893 F.2d at 468. The First Circuit concluded that the activities of members should not be attributed to an unincorporated association "[a]bsent a showing that the association had substantial

influence over the member's decision to conduct activities in the forum[.]" *Id.* at 469.

The First Circuit reasoned that, to determine whether an unincorporated association should be charged with the contacts of its members, a court should "assess the nature of the legal and institutional relationships between a particular association . . . and its constituency . . . ; the degree of control exercised by the former over the latter; and the extent to which the latter can be said to act for and on behalf of the former." *Donatelli v. Nat'l Hockey League*, 893 F.2d at 468 (emphasis omitted). Under this methodology, if the court concludes that a member of an association has minimum contacts with a forum state, the court "must proceed to assess the extent of control, if any, exercised by the association over its members (and in particular, over the member whose contacts the plaintiff wishes to attribute to the association)." *Id.* at 469. As part of this inquiry, the court should assess "the extent to which the member acts for, is an agent for, or is synonymous with, the association." *Id.* The First Circuit reasoned that the "barometer of control" should be "whether or not the association exercised substantial influence over the member's decision to carry on the in-forum activities which constitute the relevant 'minimum contacts.'" *Id.*

Applying this methodology, the First Circuit determined that certain contacts of one NHL member, the Boston Bruins corporation, could not be imputed to the NHL. *Donatelli v. Nat'l Hockey League*, 893 F.2d at 470-71. The Bruins had established contacts with Rhode Island by holding some of their annual preseason exhibition games in that state. *Id.* at 470. The Court observed that the NHL "sets the regular-season schedule'" for teams, but that its "scheduling powers do not extend to preseason games."

*Id.* Thus, "none of the control which the league exerts substantially influenced the Bruins, or any other team, to maintain contacts within Rhode Island." *Id.* The decisions by the Bruins to advertise and to seek ticket sales for preseason games in Rhode Island were "in no way mandated by the NHL." *Id.* In short, "the Bruins entered the Rhode Island market by their own choice and for their own benefit," not at the behest of the association. *Id.* at 471.

In the present case, the NCAA argues that Mr. Haw's reliance on *Donatelli* is misplaced. The NCAA asserts that Mr. Haw did not rely on the "substantial influence" theory of attribution in the circuit court. The NCAA notes that *Donatelli*, by its terms, concerns general jurisdiction rather than personal jurisdiction.[14] The NCAA argues that *Donatelli* is contrary to controlling precedent to the extent that it holds that the contacts of a third party may be attributed to a defendant without proof of an agency relationship. In reply, Mr. Haw argues that he adequately preserved this issue by raising the issue of attribution of contacts. He argues that *Donatelli*'s test for attribution of contacts should not be limited to general jurisdiction and is consistent with the principles governing

---

[14] Although *Donatelli* concerns "general jurisdiction," it employs an outdated theory of general jurisdiction that is unlike the doctrine currently mandated by the United States Supreme Court. At the time of the *Donatelli* opinion, courts widely held that a defendant could be subject to general jurisdiction wherever the defendant maintained "continuous and systematic" business contacts. *See, e.g.*, *Donatelli v. Nat'l Hockey League*, 708 F. Supp. at 34. Since that time, the Court "imposed substantial curbs on the exercise of general jurisdiction in its decision in *Daimler AG v. Bauman*[.]" *Bristol-Myers Squibb Co. v. Superior Court of California*, 582 U.S. at 269 (Sotomayor, J., dissenting). Today, the Court holds that a defendant is subject to general jurisdiction "only when a defendant is 'essentially at home'" in a forum state. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1024.

51

specific jurisdiction.

Assuming, without deciding, that the holding of *Donatelli* is sound and that it should be applied to questions of specific jurisdiction, we disagree with Mr. Haw's contention that the NCAA exerted "substantial influence" over the particular contacts at issue here. The contacts that Mr. Haw seeks to impute to the NCAA are the acts of Rutgers University and other member schools in sending recruitment communications to Mr. Haw in Maryland, as well as the acts of Rutgers when it entered into an agreement to provide him with a scholarship. The NCAA exerted "influence" over these activities in the sense that it issued rules governing the recruiting efforts of its members and the financial benefits that each member institution may provide. This kind of involvement is not the kind of "substantial influence" described by the First Circuit.

In *Donatelli*, the First Circuit analyzed "whether or not the association exercised substantial influence *over the member's decision to carry on the in-forum activities* which constitute the relevant 'minimum contacts.'" *Donatelli v. Nat'l Hockey League*, 893 F.2d at 469 (emphasis added). The Court reasoned that the NHL did not "substantially influence[] the Bruins, or any other team, *to maintain contacts* within Rhode Island." *Id.* at 470 (emphasis added). In the present case, there is no evidence that the NCAA exerted influence or control over the decisions of its member schools to engage in the contacts at issue. By all indications, Rutgers University made its own decisions to recruit a Maryland student-athlete and to make a scholarship offer.

It is true, as Mr. Haw points out, that the NCAA gains an indirect benefit from the recruitment efforts of its member institutions. When an NCAA member successfully

52

recruits an elite athlete, such as Mr. Haw, the quality of competition increases, thus enhancing the NCAA's ability to attract viewers and its opportunities to earn revenue. The *Donatelli* test of attribution, however, requires more than simply a benefit to the association. It turns on whether the association exerted some degree of control over the member's decision to conduct the activity. For the member contacts at issue in this case, this degree of association control is lacking.

As additional authority, Mr. Haw cites *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 284 F. Supp. 2d 204 (D. Mass. 2003), an opinion applying the *Donatelli* framework. In that case, a federal district court in Massachusetts concluded that it could exercise personal jurisdiction over the Castano Group, an unincorporated association of lawyers and law firms formed for the purpose of prosecuting litigation against the tobacco industry. *Id.* at 208. The court imputed to the association the work of two individual members who had performed years of tobacco litigation work in Massachusetts. *Id.* at 214-15. The court concluded that these members performed this work under the substantial influence of the association, where the association "as a whole provided the strategic and logistical plan for the various lawsuits." *Id.* at 215. The court reasoned: "It is of no moment that the [association] did not instruct that the work be done in Massachusetts; only that it *be done* and that it *was done* by group members in Massachusetts." *Id.* (emphasis in original). In our assessment, *Daynard* offers a poor analogy for the present case. The evidence here does not show that the NCAA provided a "strategic and logistical plan" or that it "instruct[ed]" its members to recruit football players. The decisions to undertake those activities were "in no way mandated by" the

53

NCAA. *Donatelli v. Nat'l Hockey League*, 893 F.2d at 470.

To reiterate, as the party seeking to attribute the contacts of third parties to the NCAA, Mr. Haw bears the burden of establishing the factual basis for attribution of contacts. *See Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1, 26 (2005). In our judgment, the circuit court did not err when it concluded that Mr. Haw failed to meet this burden. Consequently, the ultimate question of whether the NCAA is subject to specific personal jurisdiction in Maryland depends on whether the NCAA itself established minimum contacts with Maryland.

### B.     Contacts Between NCAA and Maryland

Mr. Haw contends that, even if the contacts of the NCAA's members are not imputed to the NCAA, the NCAA's own "direct contacts with Maryland" satisfy the requirement of purposeful availment. He further contends that the claims in his action "relate to" the NCAA's contacts with Maryland.

Mr. Haw argues that the circuit court erred by "failing to consider" the NCAA's own contacts with Maryland. In its oral ruling, the circuit court did not expressly discuss his contention that the NCAA's own "direct contacts" with Maryland were sufficient to establish specific jurisdiction. The court acknowledged that the NCAA "certainly maintains contacts" with Maryland, as well as with other states where its member institutions are located. The court reasoned, however, that "the alleged acts complained of" in this case were not committed by the NCAA. Yet, the only category of "acts" that the court expressly mentioned were acts "committed . . . during the recruitment process of Mr. Haw." The court stated that these acts were "committed by [] entit[ies] other than

54

the NCAA"—namely, Rutgers University or other member schools that attempted to recruit Mr. Haw.

On appeal, Mr. Haw argues that the circuit court "failed to appreciate the nature" of his claims. He argues that the substance of his complaint is the alleged misconduct of the NCAA itself, not its members. According to the complaint, the NCAA itself (and not necessarily its individual members) possessed extensive knowledge about the dangers of brain disease caused by the head impacts routinely sustained in the game of college football. The gravamen of the complaint is that, despite this knowledge, the NCAA continued to regulate college football in a way that endangered players such as Mr. Haw. The complaint alleges that the NCAA failed to inform players recruited by NCAA member institutions of these dangers, failed to establish rules of the game to make it reasonably safe, and failed to establish a protocol for the diagnosis and treatment of concussive injuries.

Mr. Haw observes that several NCAA member schools run college football programs in Maryland and that at least two of those schools participate in Division I. He states that the NCAA has "reach[ed] into Maryland" by issuing and implementing "rules and regulations governing Division I football programs and the sport itself[.]" Mr. Haw identifies three categories of NCAA rules: rules related to the recruitment of athletes by member institutions; rules related to gameplay; and rules related to the health and safety of athletes. In addition, Mr. Haw asserts that the NCAA "published to its members" a Medical Handbook, which, he says, "included deeply flawed advice about how to handle concussive injury."

55

In response, the NCAA denies the contentions that the NCAA has purposefully directed any activities at Maryland or that Mr. Haw's claims relate to any activities directed at Maryland. The NCAA takes the position that it cannot be compelled to defend claims that its rulemaking activities caused injury to an athlete, in the courts of a state where the athletic programs subject to those NCAA rules operate. The NCAA offers an array of arguments in support of that position.

To some extent, the NCAA attempts to treat some of the facts mentioned by Mr. Haw in isolation. The NCAA argues that "the fact that several NCAA members have football programs in Maryland" does not demonstrate that the NCAA has purposefully directed its activities at Maryland, nor does that fact have any substantial connection to Mr. Haw's claims. In our assessment, this argument misapprehends the full significance of that particular fact. By itself, the fact that several NCAA members have football programs in Maryland might carry minimal significance. Here, however, that fact is important to explain the *direction* of the NCAA's various rulemaking activities.

The NCAA's manifest purpose when it issues rules, standards, and guidelines is to affect the conduct of member schools, athletic programs, and student-athletes. Some NCAA rules are Association-wide, some are limited to one of its divisions, and some are limited to a particular sport. The reach of these rules may depend on whether a particular sport is played in a particular state. For instance, if no NCAA member schools operated football programs in Maryland, then the NCAA rules governing college football gameplay or the health and safety of college football players might not be said to be purposefully directed at Maryland. But because the NCAA has accepted Maryland

56

member schools and their football programs, the NCAA understands that it is directing its rules governing college football toward those programs and the athletes who play for those programs. The NCAA's rulemaking activities would be a largely empty gesture if the NCAA directed those activities solely at Indiana.

Establishing rules and standards for athletics competitions is not an insignificant activity. College football, in the form in which it currently exists in the United States, would not exist without the efforts of the NCAA or a similar rulemaking body. The United States Supreme Court has explained: "What the NCAA and its member institutions market . . . is competition itself—contests between competing institutions." *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 101 (1984). "Of course, this would be completely ineffective if there were no rules on which the competitors agreed to create and define the competition to be marketed." *Id.* "A myriad of rules affecting such matters as the size of the field, the number of players on a team, and the extent to which physical violence is to be encouraged or proscribed, all must be agreed upon . . . ." *Id.* The commercial significance of these activities cannot be easily ignored. Even though the NCAA is a nonprofit entity, "'the NCAA and its member institutions are in fact organized to maximize revenues.'" *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. ___, ___, 141 S. Ct. 2141, 2159 (2021) (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. at 100 n.22). Moreover, the "NCAA enjoys near complete dominance" of the labor market "for elite college football[.]" *Nat'l Collegiate Athletic Ass'n v. Alston*, 594 U.S. at ___, 141 S. Ct. at 2151-52 (citation and quotation marks omitted).

57

In his brief, Mr. Haw cites *Novack v. National Hot Rod Ass'n*, 247 Md. 350 (1967), in which the Court held that the acts that may support personal jurisdiction "are not necessarily limited to acts which are a part of commerce or of transactions for profit, but include acts which constitute a purposeful activity within the State." *Id.* at 356. The defendant in that case was "a non-profit California corporation which sponsor[ed] and regulate[d] automobile drag races[.]" *Id.* at 351. The Association itself had "never sponsored" a race in Maryland. *Id.* at 351-52. Its "only activities" in Maryland were "for a fee promoting and seeking to insure the safe and successful conduct of other drag race events by imposing its standards, rules and regulations as a prerequisite to its stamp of approval." *Id.* at 356. The Court held that Maryland courts could exercise personal jurisdiction over the Association in two suits claiming that the Association had sanctioned a race in Maryland at which one driver was injured and another driver was killed, allegedly because of the unsafe condition of the track. *Id.* at 356-57. We agree with the NCAA's observation that the NCAA's activities are "different" in many respects from those of the National Hot Rod Association. Nevertheless, we fail to see how the NCAA's forum-directed activities are any less substantial than those of the National Hot Rod Association, as described in *Novack*.

At various points in its brief, the NCAA attempts to cast doubt on whether rulemaking is even an "activity" of the NCAA itself. In its account, the NCAA simply "facilitates the rulemaking process and publishes the rules" that its members adopt. The NCAA cites nothing in the record that would justify such a passive description of its role. The NCAA Constitution (cited extensively throughout the NCAA's brief) specifically

differentiates the activities of the Association from the activities of its members.  The

basic distinction is that the NCAA issues and enforces the rules which its member

schools are obligated, as a condition of membership, to follow.  For example, the NCAA

Constitution states that "[t]he Association shall . . . promulgate guidance, rules and

policies . . . for student-athlete physical and mental health, safety and performance."

2022-23 NCAA Division I Manual, Constitution, Art. 2(A)(2)(b).  Similarly, it states that

"[t]he Association shall . . . [e]stablish the rules for sports competitions and

participation[.]"  *Id.*, Art. 2(A)(2)(d).  By contrast, it states: "It is the responsibility of

each member institution to control its intercollegiate athletics program in compliance

with the rules and regulations of the Association."  *Id.*, Operating Bylaws, § 8.01.2.  Any

suggestion that rulemaking, perhaps the defining activity of the NCAA, is not an activity

of the NCAA itself is untenable.[15]

In its brief, the NCAA acknowledges Mr. Haw's assertion that the NCAA's

"legislative and similar activities . . . affect member institutions in Maryland."  The

NCAA also says that, of the various activities identified by Mr. Haw, "[o]nly the . . .

activity" of "legislation . . . may in any sense fairly be considered an activity" of the

NCAA.  The NCAA nevertheless argues that "the NCAA's legislative activities are *no*

---

[15] In other cases concerning NCAA rules, courts consistently describe rulemaking as an activity of the NCAA itself, not an activity of hundreds of individual member institutions.  *E.g.*, *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma*, 468 U.S. 85, 88 (1984) (stating that "the NCAA has . . . adopted and promulgated playing rules, standards of amateurism, standards for academic eligibility, regulations concerning recruitment of athletes, and rules governing the size of athletic squads and coaching staffs").

*more directed at Maryland* than they are at any other forum." (Emphasis added.) According to the NCAA, contacts that are "the same . . . throughout the country" cannot establish a basis for specific jurisdiction. Under this argument, because the NCAA's rules are directed *everywhere* throughout the country, those rulemaking activities are not purposefully directed *anywhere*.

The NCAA's argument defies logic. To qualify as a purposefully directed activity, there is no comparative requirement that the activity must be relatively more directed at the forum state than at others. Thus, when a publisher "produces a national publication aimed at a nationwide audience[,]" the publisher might be "call[ed] . . . to answer for the contents of that publication wherever a substantial number of copies are regularly sold and distributed." *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 (1984). When a "manufacturer or distributor" makes efforts "'to serve, directly or indirectly, the market for its product in [several or all] other States,'" the manufacturer or distributor might be subject "'to suit in one of those States if its allegedly defective merchandise has there been the source of injury[.]'" *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. ___, ___, 141 S. Ct. 1017, 1027 (2021) (alteration in original) (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). As Mr. Haw points out, this Court has previously rejected the notion that, as long as a particular activity is directed "everywhere" including Maryland, the activity is not purposefully directed at Maryland. *See MaryCLE, LLC v. FirstChoice Internet, Inc.*, 166 Md. App. 481, 505-06 (2006) (reasoning that marketing company that sent unsolicited "spam" emails to residents of Maryland and other states could reasonably be

60

expected to answer for those emails in Maryland or any other state to which they were sent). Put simply, many activities are directed at more than one place. They are no less purposefully directed because they are directed at multiple locations.

In support of the position that its rulemaking activities are confined to Indiana, the NCAA cites *Aldrich v. National Collegiate Athletic Association*, 484 F. Supp. 3d 779 (N.D. Cal. 2020). In that case, former college athletes brought suit alleging that the NCAA had failed to implement and enforce rules to prevent sexual abuse by coaches or other personnel of college athletics departments. *Id.* at 790. The NCAA persuaded the federal district court in California that the court could not exercise specific jurisdiction over the NCAA with respect to those claims. *Id.* at 794-96. As part of its analysis, the court reasoned:

> The NCAA legislates in Indiana, where it is headquartered. Thus, the harm caused by the NCAA's failure to enact particular legislation arises out of Indiana. A contrary finding would improperly subject the NCAA to jurisdiction anywhere because the NCAA failed to implement legislation in all 50 states.

*Aldrich v. Nat'l Collegiate Athletic Ass'n*, 484 F. Supp. 3d at 795.

For at least two reasons, this aspect of the *Aldrich* court's analysis is unpersuasive. First, the court's analysis places undue focus on the physical location where a defendant's activity occurs, rather than where that activity is directed. Beginning with the decision in *International Shoe Co. v. Washington*, 326 U.S. 310, 316-17 (1945), courts have recognized that physical entry into a state is not necessarily required to justify personal jurisdiction. "[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by . . . communications across state lines, thus

61

obviating the need for physical presence within a State in which business is conducted." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). "So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State," the Supreme Court has "consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.* The statement that the NCAA "legislates in Indiana" reveals nothing about where that activity is directed.

Second, as Mr. Haw points out, the *Aldrich* court was mistaken to the extent that it reasoned that a proposed application of specific jurisdiction is improper if it might subject a defendant to personal jurisdiction in many or all states with respect to certain activities. In this respect, the *Aldrich* court echoed the doctrinal limits of *general* jurisdiction. It is true a defendant cannot be deemed "at home" in every state and thus that a defendant is not subject to general jurisdiction for any and all claims in the courts of every state. *See Daimler AG v. Bauman*, 571 U.S. 117, 139 n.20 (2014). The United States Supreme Court has emphasized, however, that courts should not confuse the requirements of general jurisdiction with those of specific jurisdiction. *Id.* at 132 (citing *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 927 (2011)); *see also Bristol-Myers Squibb Co. v. Superior Court of California*, 582 U.S. 255, 264 (2017). The potential reach of specific jurisdiction is not limited to one or two states per defendant. Rather, it is proportional to the reach of the defendant's purposefully directed activities. In fact, one year after the *Aldrich* opinion, the Supreme Court once again confirmed that a defendant that directs its activities "across the United States" (*Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. ___, ___, 141 S. Ct. 1017, 1022

(2021)) might be subject to specific jurisdiction "in one of those states," provided that the claims either arise out of or relate to the forum-directed activities. *Id.* at ___, 141 S. Ct. at 1027 (citation and quotation marks omitted).

In our judgment, a conclusion that an athlete allegedly injured by the NCAA's rules governing college sports may seek redress only in the state where those rules were initially made would produce unreasonable results. Under this approach, if the NCAA established rules that endangered athletes in all 50 states, then the NCAA could be sued only in its home state for claims of injuries arising from or relating to those rules. Around the time that Mr. Haw began playing college football, the NCAA's headquarters were located in Missouri. At present, the NCAA's headquarters are located in Indiana. The NCAA is free to relocate its headquarters to another location that may be far removed from the potential plaintiffs affected by the NCAA's rules. For questions of specific jurisdiction, however, what matters is the direction of the activity, not simply where the initial activity takes place. *See Burger King Corp. v. Rudzewicz*, 471 U.S. at 472-73. Traditional notions of fair play and substantial justice do not require courts to adopt the narrow view of a defendant's activities advocated by the NCAA.

In another attempt to dispute whether it has established contacts with Maryland, the NCAA argues that its suit-related activities amount to nothing more than "omissions." The NCAA notes that, although the complaint included allegations that the NCAA made certain affirmative misrepresentations, Mr. Haw's appellate brief does not discuss any of those alleged misrepresentations. The NCAA observes that Mr. Haw's claims rest on the NCAA's alleged failure to disclose information about the dangers of college football,

failure to establish rules to make the game reasonably safe, and failure to establish an effective concussion-management protocol or to require trained medical personnel on the sidelines. The NCAA also characterizes any claim based on the NCAA's publication of the allegedly "'flawed' medical handbook" as a claim premised on omissions. The NCAA argues that all of these allegations concern "non-acts" which "cannot be considered 'contacts'" with Maryland.

Seeking support for its position, the NCAA relies primarily on *Chlebda v. H.E. Fortna & Brother, Inc.*, 609 F.2d 1022 (1st Cir. 1979). In that case, the plaintiff brought wrongful death claims in Massachusetts, alleging that the decedent was killed in an accident caused by a defectively designed forklift. *Id.* at 1023. The defendant, a Pennsylvania company engaged in business as a forklift dealer, conducted none of its business in Massachusetts and had no involvement with the forklift involved in the accident. *Id.* In those circumstances, the First Circuit held that the company's alleged failure to warn potential users of the design defect was not an "'act or omission [i]n th[e] Commonwealth'" of Massachusetts within the meaning of that state's long-arm statute. *Id.* The Court reasoned that the company's alleged "failure to act" could not by itself "furnish the minimum contact with that state that is needed to confer jurisdiction." *Id.* at 1023-24.

By its terms, the *Chlebda* opinion addresses a situation in which the defendant has "no contact at all" (*Chlebda v. H.E. Fortna & Bro., Inc.*, 609 F.2d at 1024) with the forum state. *Chlebda* holds that, in those circumstances, the plaintiff cannot establish minimum contacts by characterizing the failure to act in the forum state as an activity in

64

the forum state. Here, by contrast, Mr. Haw is not attempting to rely on the absence of activity to establish minimum contacts. Mr. Haw has identified activities of the NCAA purposefully directed at Maryland: rules governing the recruitment of athletes, rules governing gameplay, and rules and guidelines related to the health and safety of players. These are voluntary contacts created by the NCAA itself. Mr. Haw alleges that, given the NCAA's knowledge, the rules and guidelines that the NCAA chose to establish were not reasonably adequate to protect the health and safety of players. In other words, what the NCAA characterizes as "omissions" are better understood as defects and shortcomings in the rules and guidelines that the NCAA purposefully directed at Maryland and other states. Mr. Haw further alleges that his injuries result from this alleged negligent or reckless rulemaking and standard setting. In this sense, Mr. Haw's claims are connected to the NCAA's purposefully directed activities.

In its appellate brief, the NCAA makes a muted challenge to Mr. Haw's contention that the claims in his action are related to the NCAA's rulemaking activities. The NCAA lists five activities mentioned in Mr. Haw's brief, the last of which is rulemaking. The NCAA asserts that "the first four activities have no real and substantial relation to [Mr. Haw's] particular claims[.]" Notably, the NCAA does not make the same assertion about its rulemaking activities.

We agree with the NCAA's argument that some of the activities mentioned in Mr. Haw's brief may lack a substantial connection to the claims raised in his complaint. Among other purported contacts, Mr. Haw asserts that the NCAA "receives dues" from Maryland member institutions. He asserts that one of the NCAA's governors is the

65

president of Morgan State University, a Maryland institution. Mr. Haw tells us that the NCAA has previously "been involved in" litigation in Maryland concerning college athletics, including the defense of a suit brought by the family of a Frostburg State University student who died after suffering a head injury during a football practice. None of the allegations in this action concern the annual dues that the NCAA collects from its members, a particular person sitting on the NCAA board of governors, or the NCAA's past litigation activities in Maryland. By contrast, however, the complaint is founded in substantial part on claims that the NCAA's negligent or reckless rulemaking and guidance caused Mr. Haw's injuries.

Mr. Haw argues that his claims at least partially arise out of the NCAA's rulemaking activities directed at Maryland. In this regard, he cites paragraphs from the complaint in which he alleged that his concussive and sub-concussive injuries occurred in "every game and practice" of his college football career. In opposition to the NCAA's motion, Mr. Haw presented evidence that he played one football game in Maryland, which he says "contributed to his injury." He asserts that the NCAA distributed its medical handbook not only to Rutgers University, but also the United States Naval Academy, the opponent in that game. He notes that the game that he played in Maryland, like all other college football games in which he played, was "subject to the NCAA's rules" which "did not require trained medical personnel on the sidelines." Mr. Haw further argues that, even if his claims do not strictly "arise out of" NCAA activities directed at Maryland, his claims at least "relate to" those activities. This formulation does not "always requir[e] proof of causation—*i.e.*, proof that the plaintiff's claim came

66

about because of the defendant's in-state conduct." *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. ___, ___, 141 S. Ct. 1017, 1026 (2021).

*Ford Motor* is the leading case discussing when claims "relate to" a defendant's activities even if the claims may not strictly "arise out of" those activities. The Court held that Ford, an automobile manufacturer, was subject to specific jurisdiction in the courts of Montana and Minnesota for claims brought by residents of those states who were injured in automobile accidents in those states. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1022. Within the two forum states, Ford had extensively advertised, sold, and serviced the same types of cars involved in the accidents. *Id.* at ___, 141 S. Ct. at 1028. The allegedly defective vehicles, however, had been manufactured and sold outside the forum states. *Id.* at ___, 141 S. Ct. at 1023. Arguably, therefore, the accidents in question did not arise out of Ford's activities directed at the forum states. *Id.* at ___, 141 S. Ct. at 1029. Ford contended that, because the claims lacked such a causal connection to its activities in the forum states, Ford was not subject to specific jurisdiction in those suits. *Id.* at ___, 141 S. Ct. at 1026.

The Court rejected Ford's contention, explaining that the requirement "that the suit 'arise out of *or relate to* the defendant's contacts with the forum' . . . contemplates that some relationships will support jurisdiction without a causal showing." *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1026 (emphasis in original). The Court concluded that Ford's activities in the forum states were sufficiently "relate[d] to" the claims of the Montana and Minnesota residents, where Ford had "systematically served a market in Montana and Minnesota" for the same types of

vehicles that the plaintiffs alleged to have caused their injuries in those states. *Id.* at ___, 141 S. Ct. at 1028. The Court added: "An automaker regularly marketing a vehicle in a State . . . has 'clear notice' that it will be subject to jurisdiction in the State's courts when the product malfunctions there (regardless where it was first sold)." *Id.* at ___, 141 S. Ct. at 1030 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

In the present case, the causal connection between Mr. Haw's claims and the NCAA activities directed at Maryland would be stronger if he had played college football for an NCAA member school located in Maryland. Under *Ford Motor*, however, this type of direct causal connection is not required. *Ford Motor* illustrates that a defendant's forum-directed activities may be "related to" a plaintiff's claims where the defendant at all relevant times directed essentially the same activity both within the forum state and elsewhere. In those circumstances, the defendant has sufficient notice that it will be subject to jurisdiction in the forum state for claims brought by residents of the forum state, even if those claims might arise out of the same activity directed elsewhere.

In his brief, Mr. Haw further asserts that "the NCAA easily could have foreseen that its contacts with Maryland might cause it to be haled into court in this State." In response, the NCAA does not directly deny this assertion. Rather, the NCAA argues that "'foreseeability' alone" is not enough. The NCAA contests whether Mr. Haw has established enough of a connection among the NCAA, Maryland, and his claims. Relying on *Walden v. Fiore*, 571 U.S. 277 (2014), the NCAA argues that Mr. Haw cannot rely on his own strong affiliations with Maryland to establish the requisite connection. There, the Court stated that, "however significant the plaintiff's contacts

68

with the forum may be, those contacts cannot be 'decisive in determining whether the defendant's due process rights are violated.'" *Id.* at 285 (quoting *Rush v. Savchuk*, 444 U.S. 320, 332 (1980)).

As the Supreme Court has explained, this proposition from *Walden* addresses the first prong of the minimum contacts analysis, which is whether a defendant has purposefully availed itself of the privilege of conducting activities in the forum state. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1031. The *Walden* Court "had no occasion" to address the second prong, which concerns "the necessary connection between a defendant's in-state activity and the plaintiff's claims." *Id*. Even though "the place of a plaintiff's injury and residence cannot create a defendant's contact with the forum State[,] [t]hose places still may be relevant in assessing the link between the defendant's forum contacts and the plaintiff's suit[.]" *Id.* at ___, 141 S. Ct. at 1031-32. Thus, the NCAA is incorrect to the extent that it argues that Mr. Haw's residence in Maryland (or the fact that the place of his alleged injuries includes Maryland) is irrelevant to the second prong of the analysis.

The NCAA seeks refuge in the Court's statement that, "[i]n the sphere of specific jurisdiction, the phrase 'relate to' incorporates real limits, as it must to adequately protect defendants foreign to a forum." *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1026. The NCAA argues that, "[w]hatever those precise limits may be," they are "surely exceeded" under Mr. Haw's proposed application of specific jurisdiction. The NCAA repeatedly argues that, because Mr. Haw's theory might be employed to subject the NCAA to specific jurisdiction throughout the country

69

for claims brought by athletes allegedly injured by the NCAA's rulemaking, then his theory must be incorrect. The defect in this argument is that it presupposes the particular outcome that it needs to prove. The assumption that a defendant cannot be subject to specific jurisdiction in many states for claims related to activities that the defendant has directed at many states is groundless. *See Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1027; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. at 781.

The NCAA's argument frequently resorts to its own characterizations of Mr. Haw's argument, which exaggerate the scope of his proposed application of specific jurisdiction.[16] Contrary to the NCAA's belief, this application of specific jurisdiction is nowhere near unlimited. To understand the limits on Mr. Haw's argument, consider how this theory would affect a different organization that did not reach quite as far as the NCAA. Suppose, for instance, that a former professional football player brought suit in Maryland against a professional football league, alleging that the league established rules that were inadequate to protect players from brain injuries. Also suppose that no teams in this hypothetical league played games or held practices in Maryland. In that scenario, the league's rulemaking activities in all likelihood could not subject the league to specific

---

[16] For instance, the NCAA writes that Mr. Haw's theory would allow him to "sue in any State based on the same generic contacts, whether or not those contacts were purposefully directed at the forum or not." The NCAA suggests that the "logical" outcome of Mr. Haw's argument would "mean [that] the NCAA is subject to jurisdiction in every State for every head-injury case ever brought[.]" The NCAA argues that permitting specific jurisdiction in this case would mean that "the NCAA would be subject to jurisdiction in every State for every claim that relates to any game ever played, no matter how tenuous the connection between the NCAA itself, the game, and the case."

jurisdiction in Maryland, a place unaffected by the allegedly negligent rulemaking.

This scenario illustrates that an organization like the NCAA certainly can "'structure [its] primary conduct' to lessen or avoid exposure to a given State's courts" for claims related to its activities. *Ford Motor Co. v. Montana Eighth Judicial District Court*, 592 U.S. at ___, 141 S. Ct. at 1025 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). In the same way, the NCAA certainly could structure its activities to insulate itself from the reach of the Maryland courts. Properly understood, the potentially broad forum exposure perceived by the NCAA is the product of how the NCAA has chosen to conduct its nationwide activities. As Mr. Haw writes in his reply brief: "No one forced the NCAA to establish and preside over an athletics league in Maryland; it cannot now disclaim responsibility for its choices."

This application of specific jurisdiction does not mean that, on the existing factual record, Mr. Haw himself could bring his claims in every state targeted by the NCAA's rulemaking activities, regardless of where he resides and where his alleged injuries occurred. Nor does it mean that Maryland courts could exercise specific jurisdiction over the NCAA for claims of similarly situated college athletes who are not Maryland residents and who did not suffer any injury in Maryland. *See Bristol-Myers Squibb Co. v. Superior Court of California*, 582 U.S. 255, 265 (2017) (holding that plaintiffs who were nonresidents of California and whose injuries occurred entirely outside California could not establish specific jurisdiction in California for claims against nonresident pharmaceutical corporation). In the present case, Mr. Haw is a Maryland resident who claims to have suffered part of his injury in Maryland. Thus, like the plaintiffs in *Ford*

71

*Motor*, he has identified an adequate link between his claims and the forum state.[17]

The final prong of our due process analysis requires us to "consider 'whether the exercise of personal jurisdiction would be constitutionally reasonable.'" *Pinner v. Pinner*, 467 Md. 463, 495 (2020) (quoting *Beyond Sys., Inc. v. Realtime Gaming Holding Co., LLC*, 388 Md. 1, 26 (2005)). Factors relevant to this determination include: "the burden on the defendant; the interests of the forum State; the plaintiff's interest in obtaining relief; the interstate judicial system's interest in obtaining the most efficient resolution of controversy; and the shared interest of the several states in furthering fundamental substantive social policies." *Camelback Ski Corp. v. Behning*, 312 Md. 330, 342 (1988) (citing *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102, 115-16 (1987) (plurality opinion)). If the first two prongs have been satisfied, the burden shifts to the defendant "to 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Pinner v. Pinner*, 467 Md. at 495 (quoting *Burger King Corp. v. Rudzewicz*, 477 U.S. 462, 477 (1985)). Only in "'rare cases'" will the exercise of jurisdiction be unreasonable "even though the threshold requirement of minimal contacts" has been met. *Camelback Ski Corp. v. Behning*, 312 Md. at 336 (quoting *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. at 116 (Brennan, J., concurring)).

---

[17] When a plaintiff's place of injury includes several states, specific jurisdiction is not confined to the state where the largest share of the injury occurred. A plaintiff who is "suing, at least in part, for damages suffered in" the forum state (*Keeton v. Hustler Magazine, Inc.*, 465 U.S. at 776) may be able to bring suit in the forum state even if "the bulk of the harm done to" the plaintiff "occurred outside" that state. *Id.* at 780.

Because the circuit court concluded that Mr. Haw had failed to establish the requisite contacts with Maryland, the court did not address the prong of constitutional reasonableness. Mr. Haw argues that requiring the NCAA to defend this action in Maryland meets the basic test of essential fairness. He argues that the NCAA, a "multi-billion-dollar enterprise" with a nationwide reach, will not endure a significant difficulty in managing the burdens of defending an action in Maryland. He argues that Maryland has a strong interest in providing him, a longtime Maryland resident, with redress for injuries caused by an out-of-state actor. He argues that he has an even stronger interest in seeking relief for the serious harm resulting from his permanent neurodegenerative brain disease. In addition, he argues that this case presents no circumstances that might make the courts of a different state (such as Indiana or New Jersey) a substantially more efficient or suitable forum for resolving this litigation.

In its brief, the NCAA does not dispute Mr. Haw's evaluation of these factors or his contention that the exercise of personal jurisdiction in Maryland is constitutionally reasonable. Likewise, in the circuit court, the NCAA never challenged the exercise of personal jurisdiction based on these reasonableness factors. The NCAA has failed "to 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Pinner v. Pinner*, 467 Md. at 495 (quoting *Burger King Corp. v. Rudzewicz*, 477 U.S. at 477).

In sum, we conclude that due process principles do not prohibit a Maryland trial court from exercising personal jurisdiction over the NCAA with respect to the claims raised in Mr. Haw's complaint. The NCAA has purposefully directed its rulemaking

activities at Maryland (as well as other states).  The claims raised by Mr. Haw, a Maryland resident who claims that he sustained at least part of his injuries in Maryland, are sufficiently related to those forum-directed activities.  Finally, the NCAA has failed to show that the exercise of personal jurisdiction in these circumstances would be constitutionally unreasonable.

## CONCLUSION

As set forth in this opinion, we have rejected two of the grounds for personal jurisdiction proposed by Mr. Haw.  The circuit court correctly concluded that the NCAA is not subject to general jurisdiction in Maryland.  The circuit court correctly concluded that Mr. Haw had failed to establish a basis for imputing the contacts of Rutgers University or other NCAA members to the NCAA itself.

We differ with the circuit court in our evaluation of the third ground relied upon by Mr. Haw, his contention that the NCAA is subject to specific jurisdiction based on its own contacts with Maryland.  The claims raised in this action relate to the NCAA's activities—issuing rules, standards, and other guidelines for college football—that are purposefully directed at Maryland.  Due process will not be violated if the NCAA is required to answer the claims that an athlete was injured allegedly as a result of its rulemaking activities, in the courts of a state targeted by those rules.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY REVERSED.  CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.  COSTS TO BE PAID ONE-HALF BY APPELLANT AND ONE-HALF BY APPELLEE.**

74